**ORDERED.**

**Dated:  July 17, 2025**

_____

Jason A. Burgess
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

KAREN W. HALL,                                                    Case No. 3:22-bk-01326-BAJ
SPUDDOG FARM PROPERTIES, LLC,                  Case No. 3:22-bk-01341-BAJ
                                                                          Chapter 11

                              Debtors.
_____/

NUTRIEN AG SOLUTIONS INC.,
formerly known as
CROP PRODUCTION SERVICES, INC.,

                              Plaintiff,

v.                                                                       Adv. No. 3:23-ap-00008-BAJ [Lead]
                                                                          Adv. No. 3:22-ap-00062-BAJ
KAREN W. HALL, _et al._,

                              Defendants.
_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

        This Consolidated Proceeding came before the Court for a four-day trial beginning on

March 25, 2024, on the Complaints brought by NUTRIEN AG SOLUTIONS, INC., formerly

known as CROP PRODUCTION SERVICES, INC. ("Nutrien") against KAREN W. HALL

("Mrs. Hall"), SPUDDOG FARM PROPERTIES, LLC ("Spuddog"), Benny F. Hall, Sr.,

individually and doing business as H&M Farms and Benny F. Hall & Sons Produce ("Mr.

Hall"), Benny F. Hall & Sons, LLC, a Virginia Limited Liability Company ("BFH LLC"), Farm Properties, LLC, a Virginia Limited Liability Company ("FP"), Benny F. Hall & Sons Trucking Co., Incorporated, a Virginia Corporation ("BFH Trucking"), Eastern Shore Grain, Incorporated, a Virginia Corporation ("ES Grain"), Holden's Creek Farm, LLC, a Virginia Limited Liability Company ("HCF"), and H&M Potato Farms, LLC, a Florida Limited Liability Company ("H&M Farms").

### **Procedural History**

In 2018, Nutrien filed a state court action in Accomack County, Virginia, against Mr. Hall, BFH LLC, and H&M Farms (the "2018 Action"), asserting multiple claims, including breach of contract. The petition was subsequently amended to add Karen Hall as a defendant, and Nutrien ultimately obtained a partial final judgment against Mr. Hall, BFH LLC, and H&M Farms.

In 2020, Nutrien filed another state court action in Accomack County, Virginia, against Mrs. Hall, Mr. Hall, BFH LLC, BFH Trucking, ES Grain, Spuddog, and HCF (the "2020 Action"). In the 2020 Action, which was consolidated with the 2018 Action, Nutrien asserted numerous claims, including breach of fiduciary duty, conversion, and fraudulent conveyance.

On July 1, 2022, Mrs. Hall filed her Chapter 11 case, and less than a week later, Spuddog filed its Chapter 11 case. In Mrs. Hall's case, Nutrien filed Proof of Claim 9 as an unsecured claim for $1,118,221.89 and attached the First Amended Petition from the 2018 Action. Nutrien also filed Claim 10 as an unsecured claim for an unknown amount and attached the Amended Complaint in the 2020 Action. In the Spuddog case, Nutrien filed Claim 3, which is identical to Claim 10 filed in Mrs. Hall's Chapter 11 case. In response, Mrs. Hall and Spuddog (collectively the "Debtors"), objected to the Nutrien proofs of claim.

On October 11, 2022, Nutrien filed an Adversary Complaint against Mrs. Hall, Spuddog, Mr. Hall, BFH LLC, BFH Trucking, ES Grain, HCF and FP, seeking a determination that its claims are non-dischargeable under 11 U.S.C. § 523 (the "Dischargeability Proceeding"; 3:22-ap-00062-BAJ).   In the Dischargeability Proceeding, the Court dismissed all claims against the non-debtors, all claims against the corporate debtor, Spuddog, and Count III as to Mrs. Hall.   Thus, Counts I-II and IV-XI of the Dischargeability Proceeding remain ripe for adjudication as to Mrs. Hall.

On January 23, 2023, Nutrien removed the consolidated state court proceeding (the "Removed Proceeding") to this Court and successfully moved to consolidate the dischargeability proceeding and the Removed Proceeding. The limited issue that remains pending in the 2018 Action is Nutrien's breach of contract claim against Mrs. Hall.   With respect to the 2020 Action, the Amended Complaint asserts the following counts that are before the Court for its determination:

> **Count I** – Breach of Fiduciary Duty (Pled Against Mrs. Hall)
>
> **Count II** – Trover/Conversion (Pled Against Mrs. Hall, HCF, and FP)
>
> **Count III** – Voluntary Conveyance (Pled Against Mr. Hall, Mrs. Hall, HCF, FP, Spuddog, and the Other Hall Entities)
>
> **Count IV** – Fraudulent Conveyance (Pled Against Mr. Hall, Mrs. Hall, HCF, FP, Spuddog, and the Other Hall Entities)
>
> **Count V** – Constructive Trust/Equitable Lien (Pled Against Mr. Hall, Mrs. Hall, BFH LLC, HCF, FP, and the Other Hall Entities)
>
> **Count VI** – Rights of a Secured Party Under the Uniform Commercial Code (Pled Against Mrs. Hall, HCF, FP, Spuddog, and the Other Hall Entities)
>
> **Count VII** – Assumpsit (Pled Against Mrs. Hall, HCF, FP, Spuddog, and other Hall Entities)

**Count VIII** - Unjust Enrichment (Pled Against Mrs. Hall, HCF, FP, Spuddog, and the Other Hall Entities)

**Count IX** – Joint Venture and/or Partnership (Pled Against Mrs. Hall, HCF, FP, Spuddog, BFH Trucking, and the Other Hall Entities)

**Count X** – Piercing the Corporate Veil and Alter Ego (Pled Against Mr. Hall, Mrs. Hall, HCF, FP, Spuddog, BFH Trucking, and the Other Hall Entities)

**Count XI** – Successor Liability (Pled Against HCF, FP, and the Other Hall Entities)

**Count XII** – Tortious Interference with Contract (Pled Against Mrs. Hall, HCF, and FP)

**Count XIII** – Aiding and Abetting Breach of Fiduciary Duty, Tortious Interference with Contract, and Conversion (Pled in the Alternative Against Mrs. Hall, HCF, and FP)

## **Findings of Fact**

Mr. and Mrs. Hall (the "Halls"), lived in Virginia their entire lives before moving to Florida in 2019. Mr. Hall, a third-generation farmer, has farming in his blood, and prior to retiring, he farmed in Virginia for over 40 years.[1] In 1992, the Halls operated a family farm in Temperanceville, Virginia, consisting of farming land with two chicken houses. In addition to raising chickens, the Halls farmed corn, wheat, soybeans, string beans, and potatoes. Mr. Hall oversaw the farming operations, working in the fields from early in the morning until late in the evening. While Mr. Hall handled the family business, Mrs. Hall worked at a local bank in an administrative role from 1974-1999. After leaving her job at the bank, Mrs. Hall assumed responsibility for the financial management and bookkeeping of the Hall entities.[2] At trial, the

---

[1] Pl.'s Ex. 406.17.
[2] Id.; Pl.'s Ex. 229, B. Hall Dep., p. 37.

evidence reflected that Mrs. Hall was in control of the various funds moved between the companies to pay bills.[3]

The Halls have consistently maintained a humble lifestyle throughout the years. During the relevant time periods, the Halls took very little, if any, salary and contributed their personal funds to the businesses. At trial, the Halls credibly testified that funds transferred to their affiliates went to pay employees, bills, and other creditors, with the intent to stay in business. Although some of these payments may have indirectly benefited the Halls, the payments also served to further the farming business.

Since 2005, Nutrien has extended the Halls credit for their farming operations.[4] Over the years the operations have expanded to include numerous entities, which acted as real estate holding companies and operational businesses. The Halls each respectively own 50% of BFH Trucking, ES Grain, FP, and Spuddog, while Mrs. Hall owns 100% of HCF. In addition to farming multiple crops, the Halls' businesses included trucking services, grain storage, produce sales, and clamshell sales. Importantly, the Halls sufficiently followed business formalities and maintained separate bank accounts, books, and records for the different entities and maintained a record of the inter-company transfers and other transactions on QuickBooks.[5] Given the nature of Nutrien's allegations, the Court will summarize the primary allegations as they relate to the Halls and their various corporate entities.

---

[3] Pl.'s Ex. 229, pp. 36, ll. 9-13; Pl.'s Ex. 406, G. Stewart Dep., p. 26; Pl.'s Ex. 414, J. Bayliss Dep., pp. 12-13, 25, 134-135 (payments over $2,500 required approval from Mrs. Hall).

[4] Nutrien refers to the Halls' obligations as the Florida Indebtedness and the Virginia Indebtedness, and the relevant loan documents were executed in 2014.

[5] Separate tax returns were prepared for ES Grain and BFH Trucking, and the Hall's joint personal tax return delineated the separate businesses for the remaining entities.

I.  **Benny F. Hall & Sons, LLC[6] - Primary Farming Entity**

In January 2013, Mr. Hall, as the sole owner, formed BFH LLC.[7]  Specifically, BFH LLC took on the following operations previously conducted through Consolidated Farms: (1) farming wheat, corn, soybeans, and fresh market potatoes; (2) raising and selling chickens;[8] and (3) selling and delivering crushed clam shells.[9]

The Halls purchased farming supplies for BFH LLC from Nutrient on credit, and while the Halls' lending relationship with Nutrien spanned over two decades, the relevant contracts establishing credit for BFH LLC were signed in 2014.[10]  Based on the Customer Profile and Security Agreement signed in 2014, Nutrien extended credit to BFH LLC under four account numbers, which Nutrien refers to as the "Virginia Indebtedness."[11]

BFH LLC farmed land owned by the Halls and rented farmland from unaffiliated third parties, however, it never owned real estate.[12]  Further, while BFH LLC once owned substantial amounts of farming equipment, some of the equipment was repossessed or sold at auction due to the dissolution of Consolidated Farms.[13]  On May 7, 2018, Mr. Hall resigned as managing member of BFH LLC and assigned ownership and control of it to Mrs. Hall.[14]  By 2019, BFH LLC no longer conducted farming operations and became inactive in April of 2020.

---

[6] BFH LLC was formed by Mr. Hall after his business and personal relationship with his son deteriorated, which led to the dissolution of the previous farming operations entity, Consolidated Farms.

[7] See, e.g., Pl.'s Ex. 406.18; Pl.'s Ex. 229, p. 13.

[8] In 2019, Mrs. Hall received a payment of $116,000 from Perdue Foods, LLC, related to a buyout of a contract for raising and selling chickens. Nutrien did not have a lien on chickens owned by BFH LLC.

[9] BFH LLC held a PACA license from June 2013 to June 2019.  Pl.'s Ex. 406.18.

[10] See Pl.'s Exs. 22-23.

[11] The last four digits of the account numbers are: *7109, *3259, *7060, & *2068.

[12] See, e.g., Pl.'s Ex. 189.149 (showing real property transfer from the Halls to Spuddog). See also Pl.'s Ex. 231, pp. 182-83 (Mr. Hall testified that he was not "aware of" BFH LLC owning any land in March of 2018); Pl.'s Ex. 406, pp. 130-133 (G. Stewart deposition testimony pertaining to payment of land rent by BFH LLC to affiliates and non-affiliates).

[13] The Halls repurchased some of the auctioned equipment with funding from BFH LLC, and upon advice from their attorney titled it under Farm Properties, LLC ("FP").  Pl.'s Ex. 36, p. 12; Pl.'s Ex. 406.46

[14] Pl.'s Ex. 189.166.

## II.    Holden's Creek Farm, LLC – Trucking Company

In 2014, Mrs. Hall formed HCF[15] to handle the transportation of potatoes and the Halls' other farming products.[16]  Although HCF had historically been a trucking company,[17] in March of 2018, HCF entered into a contract to sell grain to Associated Grain, Inc., a third-party grain buyer.[18]  Nutrien alleges that the Halls began routing crops through HCF to avoid Nutrien's lien.  Specifically, Nutrien presented evidence showing that Associated Grain paid $205,705.69 to HCF for grain produced by BFH LLC.[19]  Mrs. Hall acknowledged in her testimony that because the grain was produced by BFH LLC, the grain checks should have been paid to BFH LLC.[20]

Additionally, HCF produced QuickBooks records to Nutrien that were made available to Nutrien's Forensic Accountant, Matthew McDonald ("Mr. McDonald") for his analysis.[21]  Mr. McDonald testified that although an accounting entry showed $123,211.00 in produce sales were run through HCF in 2018, that amount was not reflected as revenue on HCF's 2018 tax return.[22]

## III.    H&M Farms (H&M Potato Farms, LLC) - Florida Based Partnership

In 2014, Mr. Hall formed the Florida based partnership H&M Farms[23] with business partner and co-farmer, Leighton Middleton.[24]  To help fund the new partnership, Mr. Hall

---

[15] HCF was formed as a Virginia limited liability company, with Mrs. Hall as the sole owner. Pl.'s Ex. 54.
[16] Pl.'s Ex. 406.20.
[17] Day 4 Trial Transcript, p. 57, ll. 14-20 (Doc. 418).
[18] Pl.'s Ex. 406.13; see also Pl.'s Ex. 3.
[19] Pl.'s Ex. 97.54; see also Pl.'s Ex. 3.
[20] Pl.'s Ex. 97, pp. 307-310.
[21] Day 2 Trial Transcript, p. 54, ll. 1-4; Motion for Sanctions, n. 4 (Doc. 321) ("Nutrien obtained QuickBooks records for Holden's Creek, Farm Properties, and Spuddog.  Accordingly, Nutrien does not seek relief against those entities related to their Quickbooks records.").
[22] Pl.'s Ex. 112.99, p. 8 (Halls' 2018 Tax Return includes HCF Schedule C); see also Day 2 Trial Transcript, pp. 82-85.
[23] The Court refers to "H&M Farms" interchangeably whether referring to the d/b/a or the LLC.
[24] Day 4 Trial Transcript, p. 7, ll. 1-4.

obtained credit from Nutrien[25] for the 2014 growing season.[26]  Undisputably, Mr. Hall executed a customer profile and security agreement on behalf of H&M Farms and a personal guarantee (the "Guaranty Agreement").[27]  Mrs. Hall, however, now asserts for the first time, that her signature on the Guaranty Agreement was forged.[28]  Notably, in 2019, Mrs. Hall stated in her Answer to the Complaint that although she did "not recall signing" the Guaranty Agreement, she acknowledged it was "her signature" on the document.[29]  Additionally, the allegation of forgery was not mentioned or made in Mrs. Hall's affirmative defenses,[30] and as recently as March of 2023 she admitted to signing the Guaranty Agreement.[31]  Mrs. Hall also argues that the Guaranty Agreement is invalid "on its face" because it is not dated, and her signature appears on the "Address Line."[32]

From November of 2014 to February of 2016, Nutrien extended credit to H&M Farms.[33] By the close of 2016, the primary account balance totaled $389,340.31, and by the close of 2019 the balance had almost doubled to $729,461.29.[34]

---

[25] Day 1 Trial Transcript, pp. 56-58; Pl.'s Ex. 26-27.
[26] Day 1 Trial Transcript, p. 103; Pl.'s Ex. 538.
[27] The H&M Farms' Security Agreement is dated January 2, 2014, and the customer profile and Guaranty Agreement were executed contemporaneously with the security agreement. Pl.'s Ex. 27.
[28] Mrs. Hall first made the forgery allegation in February of 2024, only one month prior to trial.
[29] The Guaranty Agreement was attached as Exhibit B to the Amended Complaint filed in the 2018 Action.  Defs.' Ex. 15, ¶ 12.
[30] Defs.' Ex. 15, p. 12.
[31] Nutrien objected to Mrs. Hall seeking to change her position one month prior to trial.  The Court agreed and denied Mrs. Hall's Motion to Amend Answer and Affirmative Defenses.  (Docs. 304, 315).
[32] Defs.' Post-Trial Brief, p. 6.  (Doc. 443).
[33] Pl.'s Exs. 534-35, 537-38, 540-41.  Together, Account Numbers *6743, *2531, and *0029 comprise what Nutrien refers to as the "Florida Indebtedness."
[34] Pl.'s Ex. 541 (Account Number *2531). Additionally, H&M carries an account balance of $5,087.32 under Account Number *0029.  Pl.'s Ex. 535.

In February of 2016, Mr. Hall converted[35] H&M Farms to a limited liability company.[36] Nutrien was not notified that the business was changed to an LLC, and the Halls did not execute new documents to memorialize the change.[37]

### IV.    Farm Properties, LLC[38] - Holding Company for Real Property and Farming Equipment

In June of 2015, the Halls formed FP and held it as tenants by the entirety.[39]  FP acted as a holding company for two pieces of real property[40] and all of the Halls' farming equipment.[41]

In December of 2018, the Halls received a crop insurance check for $765,013.00[42] that was directly deposited to FP.[43]  Nutrien alleges that FP is liable for conversion in the amount of the proceeds because it transferred assets and property out of the name of Benny Hall and/or BFH LLC.  Although Mrs. Hall acknowledged that the funds belonged to BFH LLC, and that "Nutrien probably had a lien on [the crop insurance],"[44] she also testified that upon FP receiving the $765,013.00 in crop insurance proceeds it promptly transferred $442,000.00 to BFH LLC.

---

[35] Mrs. Hall also makes the unsubstantiated assertion that the conversion of H&M Farms to an LLC renders her personal guaranty ineffective.
[36] Day 2 Trial Transcript, pp. 92-96.
[37] Day 2 Trial Transcript, p. 117.
[38] As of the trial date, FP still owns shelling equipment and real property in Virginia (the "Parksley Property"). Pl.'s Ex. 52, pp. 55-57.  The Parksley Property produces $850 in monthly rental income and was gifted to FP by Mr. Hall's uncle in 2017 or 2018.  Additionally, FP owns property in St. Augustine (the "St. Augustine Property") at which the Halls reside. The St. Augustine property was acquired using proceeds from stock that Mrs. Hall inherited and then sold for the purpose of purchasing the St. Augustine Property.  Pl.'s Ex. 52, p. 56.
[39] Pl.'s Ex. 53.
[40] The real property owned by FP consisted of the "Horsey Property" located at 29350 Horsey Rd., Oak Hall, VA 23416 and the "Wilkerson Farm" located near Temperanceville, VA 23442.  Pl.'s Ex. 406.18; Pl.'s Ex. 52, pp. 33-34.  In May of 2016, FP purchased 552 Boxwood Place, St. Augustine, FL 32086, (the "St. Augustine Property") from a third party.  Pl.'s Ex. 52, pg. 56.
[41] Pl.'s Ex. 406.18.
[42] Total insurance proceeds of $975,225 less deduction for premiums of $210,212 netted $765,013.  Day 2 Trial Transcript, p. 76; Pl.'s Ex. 341.16.
[43] Day 4 Trial Transcript, pp. 65-66; Pl's Ex. 341.16.
[44] Day 4 Trial Transcript, p. 60, ll. 1-3.

The evidence also reflects that FP directly and indirectly transferred $290,692.00 to H&M Farms and used the remaining funds to pay bills, primarily on encumbered farming equipment.

Although the Halls typically received crop insurance funds through BFH LLC, they assert that they chose to deposit the funds into FP because they were in the process of closing the BFH LLC bank account and were unsure when their crop insurance claim would be processed.[45]  Mr. Hall testified that the crop insurance proceeds were BFH LLC's property because they were from BFH LLC's farming operations.[46]  BFH LLC then transferred the funds to various entities for the purpose of paying business expenses.[47]  By 2019, the Halls were running most of their business income and expenses through the FP bank account.[48]

In addition to the crop insurance proceeds, Nutrien alleges that over $500,000.00 in funds were misdirected via transfers from BFH LLC to FP between 2017 and 2019 (the "FP Misdirected Funds"), and that such funds constitute fraudulent transfers.[49]  Mr. McDonald[50] "calculated that [] the net amount of $548,506.00[51] in [BFH LLC] funds deposited into FP's deposit account in 2017 and 2019 was retained by FP."[52]  Although Mr. McDonald testified extensively on the FP Misdirected Funds, his testimony was general in nature and only offered approximate amounts of transactions from 2016 to 2020.[53]  In response, the Halls presented credible testimony and evidence that to the extent any funds were "misdirected," such funds

---

[45] Pl.'s Ex. 52, pp. 152-53.
[46] Pl's Ex. 231, pp. 78, 95-96, 98, 104, 106, 117, 125.
[47] Pl.'s Ex. 52, pp. 154-57.
[48] Id. at pp. 181-82.
[49] Pl.'s Post-Trial Brief on Dischargeability, p. 12.  (Doc. 441).
[50] Mr. McDonald testified that BFH LLC was insolvent as of March 31, 2018, December 31, 2018, and December 31, 2019.  Day 2 Trial Transcript, p. 55.
[51] Mr. McDonald calculated the net amount based primarily on the style of entries made by the Halls or their accountant.  See Day 2 Trial Transcript, pp. 67-68.
[52] Pl.'s Post-Trial Brief on Dischargeability, p. 12.
[53] Day 2 Trial Transcript, pp. 64-69.

were used for business expenses and not personal gain.[54]    Additionally, the vast majority of funds, in the amount of $488,536.00, arose in 2017, prior to Nutrien threatening litigation and declaring a default.[55]

On August 22, 2016, Mr. Hall and BFH LLC executed a bill of sale for numerous pieces of farming equipment[56] and transferred the equipment to FP for a purchase price of $569,225.58.[57]    According to Mrs. Hall, FP used proceeds from a chicken farm it sold to pay the equipment purchase price to BFH LLC.[58]    In September of 2016, FP purchased a piece of equipment for $83,100.00 with funds from BFH LLC,[59] and Mrs. Hall asserts that these funds were repaid from FP to BFH LLC.[60]

In February of 2017, FP obtained an equipment loan from Loeb Term Solutions (the "Loeb Term Loan") for approximately $1,000,000.00, which was used by the Halls to pay other outstanding business debts.[61]    In August of 2017, FP purchased equipment from an auction for $306,360.00,[62]    and approximately a week later BFH LLC transferred $338,000.00 to FP to cover this purchase.[63]    This transfer was treated by the Halls' accountant as a loan from BFH

---

[54] See, e.g., Day 4 Trial Transcript, p. 62, ll. 13-17.  Although Nutrien presented tens of thousands of pages of documentary evidence, conducted numerous depositions, used computer and accounting forensic experts, and had the best possible legal counsel, Nutrien was unable to specify how the Halls personally benefitted from these transfers.  These circumstances further strengthen the Court's determination that the Halls' testimony on this point was credible.

[55] Pl's Ex. 509, p. 17; Day 2 Trial Transcript, p. 67.

[56] Although some equipment was repurchased at auction following the dissolution of the father/son partnership, the evidence was unclear whether this particular transaction was purely a transfer or if it was a repurchase at auction.  See, e.g., Pl.'s Ex. 36, p. 12; Pl.'s Ex. 52, pp. 11, 144-45, 220, 224-26; Pl. Ex. 406, pp. 124-25.

[57] Pl.'s Ex. 52.39.

[58] Pl.'s Ex. 52, pp. 225-27.

[59] Pl.'s Ex. 52.38, p. 6; Pl.'s Ex. 52, pp. 223-24.

[60] Pl.'s Ex. 52, pp. 224-25.

[61] Pl.'s Ex. 52, pp. 211-13; Pl.'s Ex. 52.35.

[62] Pl.'s Ex. 52, p. 144; Pl.'s Ex. 52.19, p. 3 (Payee indicated as Zeb Barfield Auction); Pl.'s Ex. 52.15.

[63] Pl.'s Ex. 52, p. 144; Pl.'s Ex. 52.19, p. 3.

LLC to FP,[64] which was "repaid" by FP when it transferred $440,000.00 to BFH LLC on December 5, 2018.[65]

In March of 2017, the Halls began depositing income from clam shell sales[66] into the FP account, which FP used to make payments on BFH LLC's debts or expenses.[67] In addition to paying BFH LLC's expenses, FP also periodically transferred funds to BFH LLC. For example, Mrs. Hall testified that the FP "loan" of $232,763.63 in June of 2018 to BFH LLC came from the sale of real estate owned by FP.[68] Further, some of the transfers from BFH LLC to FP were made for administrative convenience at the request of a BFH LLC vendor.[69]

## V.    Spuddog Farm Properties, LLC – Holding Company for Real Property

The Halls formed Spuddog Farm Properties in February of 2016, as a Virginia limited liability company, and own it as tenants by the entirety. A month after the formation of Spuddog, the Halls transferred real property from their personal names into Spuddog for the purpose of obtaining a business loan.[70] Notably, Nutrien never held a mortgage on the real property owned by the Halls or their companies. Further, the Hall's default on their obligations to Nutrien occurred years after the transfer of the real estate to Spuddog, and Nutrien presented very little, if any, evidence that implicated improper transfers involving Spuddog. Accordingly, Spuddog prevails on all relevant counts.

## VI.    The Halls' Default and Nutrien's Issuance of Food Security Act Notices

---

[64] Pl.'s Ex. 52.37.
[65] Id.; Pl.'s Ex. 52, pp. 220-23.
[66] The testimony and evidence reflect that the clam shell sales were deposited in various accounts over the years.
[67] Clam shells were clearly not covered under the BFH LLC Security Agreement, which solely provided for a lien on "[a]ll Debtor's crops whether growing or to be grown; all Debtor's farm products, grains, feeds, seed, fertilizers, agricultural chemicals and other supplies used in the Debtor's business or farming operations." Pl.'s Ex. 23.
[68] Pl.'s Ex. 52, p. 149; Pl. Ex. 52.19, p. 5.
[69] Pl.'s Ex. 52, pp. 150-51.
[70] Pl.'s Ex. 189, p. 538; Pl.'s Ex. 189.149 (duplicate at 285.65). World Business Lenders ("WBL") loaned funds to the Halls. WBL required that the real property securing the loan be held in a corporate entity. These matters were covered extensively in a related adversary proceeding. See 3:22-ap-00086-BAJ.

In February of 2018, Nutrien declared the Halls in default of their loan obligations and issued demand letters to the Mr. Hall and BFH LLC.[71]  Shortly thereafter, Nutrien began issuing notices to potential buyers pursuant to the Food Security Act ("FSA Notices") that it had a lien on crops produced by BFH LLC, Mr. Hall, and H&M Farms.[72]  In response to the FSA Notices, Hollar & Greene Produce ("Hollar & Greene"), a third-party produce buyer, issued joint checks made out to Nutrien and BFH Produce[73] (the "Involuntary Payments"), and sent the joint checks to Nutrien at the end of February of 2018.[74]  Mr. Hall contacted Nutrien regarding release of the funds.[75]  Nutrien refused to release the joint checks absent an agreement for the Halls to make certain payments on all outstanding Nutrien accounts.[76]  The parties did not agree to repayment terms.  In July of 2018, Nutrien's attorney contacted the Halls to have them endorse the joint checks and eventually the funds were applied to the Halls' outstanding accounts with Nutrien.[77]

Although the joint checks were issued in February of 2018, the funds totaling $41,417 were not applied to the Halls' account until September of 2018.[78]  The Involuntary Payments are a source of contention between the Halls and Nutrien because the Halls maintain they suffered a $500,000.00 loss from a spoiled cabbage crop due to Nutrien's refusal to release the Hollar & Greene funds.[79]  Shortly after declaring the Halls in default, Nutrien commenced the 2018 Action.

---

[71] Pl.'s Ex. 31.  Based on the BFH LLC security agreement, Nutrien had the right to the possession of certain collateral upon default.  See, e.g., Pl.'s Ex. 52.23.

[72] See, e.g., Pl's. Ex. 52.23-52.26.

[73] Pl.'s Ex. 544.  Mrs. Hall maintains that she was unaware that BFH Produce had received an FSA Notice from Nutrien and stated that, had she been aware, BFH Produce should have issued joint checks to Nutrien and BFH LLC based on receipt of the FSA Notice.  Pl.'s Ex. 52, pp. 44-45.

[74] Pl.'s Ex. 544; Day 1 Trial Transcript, p. 45.

[75] Day 1 Trial Transcript, pp. 47-48.

[76] Id.

[77] Pl.'s Ex. 544.

[78] Compare Pl.'s Ex. 544 with Pl.'s Ex. 541, p. 6 (three entries on 09/07/18).

[79] Day 4 Trial Transcript, pp. 17-19; Pl.'s Ex. 406, pp. 35-37.

### Analysis

This Proceeding involves a plethora of legal issues, many of which are interconnected. The Court will begin by examining Nutrien's claim for breach of contract against Mrs. Hall based on her guaranty of the Florida Indebtedness and Mrs. Hall's related defenses. Next, the Court will examine the counts plead in the 2020 Action. Finally, the Court will adjudicate Nutrien's claims under 11 U.S.C. § 523.

### I.    Breach of Contract (Count III of 2018 Action) (related to H&M Farms Indebtedness[80] as to Mr. Hall, Mrs. Hall, H&M Farms)[81]

Mrs. Hall argues that the Guaranty Agreement related to the H&M Indebtedness is unenforceable for various reasons. Primarily, she asserts that her signature was forged. As discussed below, the Court finds that Mrs. Hall's signature on the Guaranty Agreement is valid, and the agreement is otherwise enforceable.

#### A.    *Mrs. Hall's signature was not forged*

A key dispute between the parties is whether Mrs. Hall executed a personal guarantee when Nutrien extended credit to fund the Halls' Florida operations. Although Mr. Hall undisputedly executed the Guaranty Agreement in conjunction with the H&M Farms' loan,[82] Mrs. Hall adamantly maintains that her signature on the Guaranty Agreement was forged.

---

[80] In the Amended Petition filed in Accomack County, Virginia, Nutrien refers to the Florida Indebtedness as the "H&M Indebtedness." *See* Notice of Removal (Doc. 1, Exhibit A, Part 3, p. 12).

[81] Although Count III of the Amended Petition in the 2018 Action also pertains to Mr. Hall and H&M Farms, a Partial Final Judgment (Pl.'s Ex. 229.5) was already entered as to Mr. Hall and H&M Farms and the Court will focus its discussion on Mrs. Hall only.

[82] The H&M Farms' Security Agreement is dated January 2, 2014, and the customer profile and Guaranty Agreement were executed contemporaneously with the security agreement. Pl.'s Ex. 27.

14

During the trial, this issue was thoroughly vetted by both parties, and the Court has given the subject serious consideration.

Based on the evidence, and the previous positions Mrs. Hall took throughout the protracted litigation with Nutrien, the Court finds Mrs. Hall's forgery defense to be unpersuasive. When Mrs. Hall filed her Answer to the Complaint in June of 2019, she specifically stated that although she did "not recall signing" the Guaranty Agreement, she acknowledged it was "her signature" on the document.[83] Additionally, despite raising six (6) affirmative defenses in her Answer, she made *no* mention of forgery.[84] Furthermore, as recently as March of 2023, she admitted signing the Guaranty Agreement.[85]

Almost five years after filing her Answer,[86] Mrs. Hall inexplicably asserted for the first time that her signature was forged. In February of 2024, Mrs. Hall filed a Motion to Amend Answer and Affirmative Defenses (the "Motion for Leave").[87] The Motion for Leave mischaracterizes the timing of events and fails to acknowledge that Mrs. Hall's answer to the state court complaint was filed years earlier.[88] In response, Nutrien filed an objection correctly stating that Mrs. Hall abruptly sought to change her position one month prior to trial.[89]

After considering the Motion for Leave and Nutrien's objection, the Court entered an order denying the Motion for Leave.[90] The Court hereby reaffirms its denial of the Motion for Leave. That ruling was proper based on the undue delay by Mrs. Hall and the potential

---

[83] The Guaranty Agreement was attached as Exhibit B to the Amended Complaint filed in the 2018 Action. Defs.' Ex. 15, ¶ 12.
[84] Id.
[85] Pl.'s Ex. 41, p. 5 (Mrs. Hall admitted signing "one piece of paper for the Florida account").
[86] It is troubling to the Court that Mrs. Hall did not raise the issue of her signature being forged until nearly five (5) years after she filed her Answer to the Complaint.
[87] Doc. 168.
[88] Id.
[89] Doc. 304.
[90] Doc. 315.

prejudice to Nutrien.[91]    Notwithstanding the Court's dispositive ruling, Mrs. Hall repeatedly

asserted during the trial that her signature was forged.[92]    The Court, however, does not find the

supporting evidence or the testimony offered by Mrs. Hall to be convincing.    Accordingly, the

Court finds that Mrs. Hall signed the Guaranty Agreement for the Florida Indebtedness.

        B.        *Unilateral conversion of H&M Farms to an LLC*
               *did not eliminate the personal guaranty*

Mrs. Hall argues that her personal guaranty is ineffective because she and her husband

converted H&M Farms to a limited liability company in 2016.[93]    The Court finds this argument

unavailing.    The Halls did not execute new loan documents with Nutrien to memorialize the

change nor did they provide formal notice of the change to Nutrien.[94]    Thus, the unilateral

change by the Halls in and of itself is insufficient to eliminate Mrs. Hall's personal guaranty.[95]

        C.        *The placement of Mrs. Hall's signature does not*
               *invalidate the Guaranty Agreement*

Mrs. Hall next argues that the Guaranty Agreement is invalid "on its face" because it is

not dated, and her signature appears on the address line.[96]    The Court finds this argument

unavailing.    It would be incongruent with the spirit of general principles of contract law for the

Court to find the Guaranty Agreement invalid simply because Mrs. Hall signed on the incorrect

---

[91] <u>Aspen Am. Ins. Co. v. Tasal, LLC</u>, No. 6:20-cv-00875, 2021 U.S. Dist. LEXIS 205764, at *9 (M.D. Fla. 2021) ("a motion to amend may be denied on numerous grounds such as undue delay, undue prejudice to the [opposing party], and futility of the amendment"); <u>Grenier v. Marlow Yachts, Ltd.</u>, 2013 U.S. Dist. LEXIS 196939, at *3-4 (M.D. Fla. 2013) (finding undue delay after 17 months).

[92] <u>See, e.g.</u>, Day 4 Trial Transcript, pp. 8-9.

[93] Defs.' Post-Trial Brief, ¶ 24 (citing Day 2 Trial Transcript, p. 91, ll. 12-14).

[94] The only purported notice to Nutrien of the change in legal status of the borrower was the Halls' display of a sign that was visible from the highway.  Day 4 Trial Transcript, p. 139.

[95] <u>Herc Rentals v. Superior Site Servs.</u>, 357 So. 3d 783, 786 (Fla. Dist. Ct. App. 2023) (finding trial court committed reversible error when it released personal guarantor based on obligor changing corporate structure without notice to creditor).

[96] Defs.' Post-Trial Brief, p. 6.

line.[97]   Specifically, "[t]here is a presumption that the parties signing legal documents are competent, that they mean what they say, and that they should be bound by their covenants."[98] Mrs. Hall did not rebut this presumption.  Therefore, the Court finds that Mrs. Hall's signature binds her to the terms of the Guaranty Agreement.

### D.    *Mrs. Hall's Answer and Affirmative Defenses*

Mrs. Hall filed an Answer and Affirmative Defenses to the Amended Petition filed by Nutrien in the 2018 Action.[99]  As discussed above, Mrs. Hall admitted that she signed a guaranty for the Florida Indebtedness.[100]   In her Answer, Mrs. Hall raises the following affirmative defenses: (1) discharge by material alteration of liability; (2) laches; (3) lack of intent/capacity to contract; (4) defense of first breaching party; (5) failure of consideration; (6) unenforceability under Florida Statute § 501.204.

At trial, Mrs. Hall focused on her allegation that her signature on the guaranty was forged and did not offer evidence specifically in support of these affirmative defenses.[101]  The forgery allegation has already been addressed and rejected by the Court.[102]   Accordingly, the Court finds these affirmative defenses[103] were abandoned and will not discuss their merits.[104]

### E.    *Mrs. Hall's Objection to Claim*

---

[97] See, e.g. In re Barrido, 69 B.R. 316 (Bankr. M.D. Fla. 1987) (The court rejected the trustee's argument that a notary's signature was invalid where it appeared on the wrong line of a mortgage.); Wright v. SSC Nashville Operating Co., LLC, 2017 U.S. Dist. LEXIS 33127, at *6 (M.D. Tenn. 2017) ("That the signatories happened to sign on the wrong lines does not render the agreement a nullity."); In re Schiele's Estate, 51 So. 2d 287, 290 (Fla. 1951) (holding will was valid based on testator's signature on attestation clause even though attestation clause is not technically part of a will).
[98] Mandell v. Fortenberry, 290 So. 2d 3, 7 (Fla. 1974).
[99] Defs.' Ex. 15, ¶ 12.
[100] Id.
[101] See Day 1-4 Trial Transcripts; Mrs. Hall also did not address the affirmative defenses in her Post-Trial Brief.
[102] See supra pp. 14-16.
[103] Mrs. Hall pled certain affirmative defenses in her Answer to the Amended Petition in the 2018 Action.
[104] See Cannie v. Golf (In re Cannie), 2024 U.S. App. LEXIS 13004, *6 (11th Cir. May 30, 2024) (failure to properly prosecute argument may be deemed abandonment).

In her Objection to Claim,[105] Mrs. Hall raises additional defenses not raised in her Answer to the 2018 Action.  In the Objection to Claim, although Mrs. Hall does not allege forgery, she asserts that she does not recall signing the Guaranty Agreement.[106]  This argument has already been sufficiently addressed.[107]   Next, Mrs. Hall asserts that Nutrien failed to mitigate its damages.[108]  Specifically she states that Nutrien failed to "release $12,000 that would have in turn enabled the Debtors to yield approximately $500,000 in cabbage revenue."[109]  Although the Halls may very well believe this, the evidence does not support these assertions and Mrs. Hall bears the burden of proof with respect to her failure to mitigate defense.[110]  In sum, the Court finds that Mrs. Hall's testimony regarding the cabbage crop lacked specificity and clarity.  For example, Mrs. Hall did not personally make the request to release the funds and was not sure of what date the request was made.[111]  It is undisputed that the Halls were in dire financial straits, which precipitated their defaulting on payments to numerous creditors, including Nutrien.  The Halls financial problems did not occur in a vacuum and the Court cannot single out Nutrien for failing to release $12,000.00, when the Halls were also significantly in debt to numerous other creditors.

Further, the Court notes that the Halls made few, if any, voluntary payments to Nutrien after Nutrien declared a default and sent out the FSA notices.[112]  Nutrien's Accounts Receivable Ledger for H&M Farms' shows an outstanding balance of $752,899.53 as of August 31,

---

[105] In her Post-Trial Brief, Mrs. Hall asserts that she "consistently and unequivocally has taken the position" that her signature on the Guaranty Agreement was forged.  Yet, in her Objection to Claim (Main Case, Doc. 157) she makes no mention of forgery.  Instead, she states that she does not recall signing any documents related to the Nutrien debts.  (Main Case, Doc. 157, ¶ 11).

[106] Main Case, Doc. 157, ¶ 11.

[107] See supra pp. 14-16.

[108] Main Case, Doc. 157, ¶ 12.

[109] Id.

[110] See, e.g., Reiner v. Family Ford, Inc., 146 F. Supp. 2d 1279, 1286 (M.D. Fla. 2001)

[111] See Day 4 Trial Transcript, pp. 16-18.

[112] See, e.g., Day 4 Trial Transcript, p. 97.

2018.[113]   Over an almost five year period, from August of 2018 until June of 2023, Nutrien

received payments totaling approximately $44,417.00, which equates to less than 6% of the

outstanding balance as of August of 2018.[114]   Notably, all of these payments were

involuntary.[115]   Therefore, even if Nutrien had released the $12,000 to the Halls, the evidence

does not support the conclusion that the Halls would have been financially capable of suddenly

making substantial voluntary payments.[116]

Mrs. Hall also testified that the parties nearly reached a settlement, yet she did not want

to commit to making payments without certainty of future performance.   The Court finds Mrs.

Hall's lack of confidence to commit to future payments to Nutrien is incongruous with her

assertion that the cabbage crop would have yielded $500,000.00.   Ultimately, the evidence in

support of Mrs. Hall's failure to mitigate defense was scarce.   Additionally, Mrs. Hall failed to

offer a legal basis showing that Nutrien was under an obligation to release the $12,000.00 in

funds.

Finally, Mrs. Hall asserts that Nutrien failed to credit payments made by the Halls.

Despite this assertion, Mrs. Hall offered no evidence in support of this argument at Trial.

Accordingly, Mrs. Hall did not meet her burden to overcome the prima facie validity of Claim

9 filed by Nutrien.[117]

---

[113] Account number ending in 2531.

[114]  Four payments were made in the amounts of $3,682.50, $7,302.50, $30,432, and $3,000.  Pl.'s Ex. 541, pp. 6-7. Pl.'s Ex. 541, pp. 6-7.

[115] The first three payments were joint checks from Hollar & Greene, and the fourth payment stems from the sale of the Halls' real property in partial satisfaction of Nutrien's judgment lien.  See Pl.'s Post-Trial Brief on Liability (Doc. 442, p. 2).

[116] In essence, the release of $12,000.00 would have been a further extension of credit on an already inflated balance that, under ideal circumstances, was expected to be paid off each year when crops were harvested.

[117] "When a proof of claim contains all the information required under Rule 3001, it 'constitutes prima facie evidence of the validity and amount of the claim.'"  In re Nilhan Fin., LLC, 627 B.R. 529, 535 (Bankr. M.D. Fla. 2021).

Based on the foregoing, the Court finds in favor of Nutrien and against Mrs. Hall as to Count III of the Amended Petition in the 2018 Action for Breach of Contract. The Court finds that Nutrien holds an unsecured claim in Mrs. Hall's Chapter 11 case in the amount of $1,118,221.89 as asserted in proof of claim 9.

## II.    Breach of Fiduciary Duty (Pled Against Mrs. Hall) – Count I of 2020 Action

### A.  *Nutrien Lacks Standing*

For the reasons set forth below, Nutrien lacks standing to bring a breach of fiduciary duty claim against Mrs. Hall for alleged "unlawful distributions … to [BFH LLC]'s members."[118]  Nutrien argues[119] that "upon the winding up of [BFH LLC], [its] assets should have been distributed for the benefit of creditors, including Nutrien, and no unlawful distributions should have been made to [BFH LLC]'s members until all creditors were paid."[120]

Under Virginia law,[121] the elements of a breach of fiduciary duty claim are: (1) a fiduciary duty is owed, (2) a breach of that fiduciary duty, and (3) the breach resulted in damages.[122]  Although an officer or director of a corporation typically owes no fiduciary duty to the company's creditors, "[o]nce a corporation enters the zone of insolvency, the fiduciary duties owed by the [d]irectors extend also to the corporation's creditors[.]"[123]  However,

---

[118] Pl.'s Post-Trial Brief on Liability, p. 11 (Doc. 442).
[119] Nutrien relies on Va. Code Ann. § 13.1-1049, which provides a priority scheme for distributing the assets of a limited liability company upon its winding up.
[120] Pl.'s Post-Trial Brief on Liability, p. 11 (Doc. 442).
[121] Nutrien's claims in the 2020 Action are tort claims. When determining tort claims, Virginia courts typically apply the law of the state where the tortious actions occurred.  See Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999).  Similarly, Florida resolves conflicts of law in tort to apply the law of the state with the most significant relationship to the alleged tortious occurrence.  See State Farm Mut. Auto. Ins. Co. v. Olsen, 406 So. 2d 1109, 1110-11 (Fla. 1981).  Under either test, the Court must apply Virginia law.
[122] Plumbers & Steamfitters Union Loc. No. 10 v. Waters, 451 F. Supp. 3d 543, 550 (E.D. Va. 2020).
[123] Schnelling v. Crawford (In re James River Coal Co.), 360 B.R. 139, 170 (E.D. Va. 2007).

Virginia case law has *not* definitively determined whether a *similar* duty exists for a manager of an LLC.

The Court finds the most instructive case on this issue to be a district court decision that determined how the Supreme Court of Virginia would likely determine a manager's duty when a limited liability company enters the zone of insolvency.[124]  The dispute in <u>Schwab</u> involved an arbitration award obtained by Charles Schwab against a wealth investment advisory firm, which attempted to avoid the judgment by transferring their clients to a newly formed company.[125]  Charles Schwab brought claims for successor liability, fraud, conspiracy, breach of fiduciary duty, aiding and abetting, and imposition of a constructive trust or equitable lien.[126]

The district court analyzed the statutory language of the Virginia Limited Liability Company Act (the "VLLCA"), including Virginia Code § 13.1-1049 (which Nutrien also relies upon).[127]  In reaching its decision, the district court stated as follows:

> [W]ere this issue presented to the Supreme Court of Virginia, the Supreme Court of Virginia would conclude as a matter of law based on the text and structure of the VLLCA that Schwab does not have standing to sue any of the members of [the dissolved LLC] for breach of fiduciary duty based on a wrongful distribution to its members.[128]

The Court agrees with the analysis in <u>Schwab</u>.  Accordingly, the Court finds that the VLLCA does not provide Nutrien standing to bring a breach of fiduciary duty claim against the members of BFH LLC, and the Court will deny Nutrien's claim for breach of fiduciary duty against Mrs. Hall.[129]

### B.  *Nutrien Failed to Prove Self-Dealing*

---

[124] <u>Charles Schwab & Co. v. WS Wealth Mgmt. LLC</u>, 2016 U.S. Dist. LEXIS 166988 (E.D. Va. Dec. 2, 2016).

[125] <u>Id.</u> at *8.

[126] <u>Id.</u> at *2.

[127] Pl.'s Post-Trial Brief on Liability, pp. 10-11 (Doc. 442).

[128] <u>Charles Schwab & Co.</u>, 2016 U.S. Dist. LEXIS 166988 at *36.

[129] The Court does not find the case relied on by Nutrien to be instructive on this issue. See <u>Luria v. Bd. of Dirs.</u>, 277 Va. 359 (2009); Pl.'s Post-Trial Brief on Liability, p. 10.

While the Court has already found that Nutrien lacks standing to bring its claim for breach of fiduciary duty, the Court further finds that even *if* standing existed, Nutrien's claim would still fail based on its failure to prove self-dealing.[130]  Importantly, officers or directors generally owe *no* fiduciary duty to creditors of a corporation.  Exceptions to this rule are "extraordinary" and can "be permitted only when it becomes necessary to promote justice."[131]

Nutrien conducted extensive discovery, and hundreds of documents were admitted into evidence.  These documents primarily included bank statements, tax returns, invoices, and credit-related documents.  Despite the extensive discovery, Nutrien failed to prove that funds went into Mr. and Mrs. Hall's own pockets.  The Halls credibly testified that funds transferred to their affiliates were used to pay employees, bills, and other creditors.  While some of the payments may have indirectly benefited the Halls, these payments also primarily served to further the farming business.[132]

Based on the testimony and evidence, the Court finds that the Halls' honestly intended to stay in business, continue farming, pay their employees, and pay back their creditors.  The Halls have also consistently maintained a humble lifestyle, and Nutrien failed to prove that the transfers resulted in enriching the Halls beyond what would amount to modest compensation for diligent labor.  As stated above, imposing such a duty would be an extraordinary remedy, which is not justified absent proof of self-dealing.[133]  Notwithstanding a *rigorous* investigation,

---

[130] Bank of Am. v. Musselman, 222 F. Supp. 2d 792, 799-802 (E.D. Va. Oct. 7, 2002) ("officers of an insolvent corporation cannot be held personally liable for corporate debts absent the presence of self-dealing facts").

[131] Id. at 797 (quoting Cheatle v. Rudd's Swimming Pool Supply Co., 234 Va. 207 (1987)).

[132] Examples include: (1) a new roof the Halls paid for on real property they owned, which also served as an office for their businesses; (2) funds paid to a creditor for a vehicle titled to Mr. Hall but driven as a service truck by an employee of BFH LLC.  Day 3 Trial Transcript, p. 111-12; Pl.'s Ex. 52, p. 165; Day 4 Trial Transcript, p. 101, ll. 9-11.

[133] Steinberg v. Kendig (In re Ben Franklin Retail Stores), 225 B.R. 646, 653-56 (Bankr. N.D. Ill. 1998) (finding no self-dealing, notwithstanding the wrongful, potentially fraudulent, actions of the defendants, because such actions were taken to prolong the life of the corporation); see also Musselman, 222 F. Supp. 2d at 799-802.

Nutrien failed to prove that the transfers resulted in personal pecuniary gain to the Halls. Accordingly, the Court finds Nutrien did not prove Mrs. Hall breached a fiduciary duty to Nutrien.

### III.    <u>Trover/Conversion (Pled Against Mrs. Hall, HCF, and FP) – Count II of 2020 Action)</u>

Nutrien asserts that HCF, FP, and Mrs. Hall are liable for conversion.[134]  Under Virginia law, to prove a claim for conversion, Nutrien must prove the following elements by a preponderance of evidence: (i) ownership or right to possession of property at the time of conversion; and (ii) the defendant's conversion by the wrongful exercise of dominion or control over plaintiff's property, depriving plaintiff of possession.[135]

Based on the BFH LLC security agreement, Nutrien had the right to possess certain collateral upon default,[136] and in early February of 2018, Nutrien sent Mr. Hall and BFH LLC a written notice of default and demand for payment.[137]  Later that month, Nutrien began sending the FSA Notices to potential crop purchasers regarding Nutrien's lien on crops produced by BFH LLC, Mr. Hall, and H&M Farms.[138]  In response to these notices, Hollar & Greene issued joint checks made out to Nutrien and BFH Produce.[139]

Despite the Halls' requests, Nutrien did not release the funds,[140] and after several months, Nutrien applied the funds to the Halls' outstanding debts.[141]    From the Halls'

---

[134] Nutrien did not prove that crops produced by Contrel Brown were subject to their lien.  Additionally, any funds generated by Contrel Brown or received by the Halls from Contrel Brown are not subject to the conversion claim because the agreement primarily allowed the Halls to pay land rent, and these landowners would have a right to payment for crops produced on their land.

[135] <u>Fed. Ins. Co. v. Smith</u>, 144 F. Supp. 2d 507, 518 (E.D. Va. 2001), <u>aff'd</u>, 63 F. App'x 630 (4th Cir. 2003).

[136] Pl.'s Ex. 23, p. 3, ¶.

[137] Pl.'s Ex. 31.

[138] <u>See, e.g.</u>, Pl.'s Ex. 52.23.

[139] Pl.'s Ex. 544.

[140] <u>See, e.g., supra</u> p. 12.

[141] <u>Id.</u>

perspective, the inability to receive these funds crippled their operations and caused over $500,000.00 in damages from a lost cabbage crop.[142]

A.    *HCF Contract with Associated Grain*

On March 5, 2018, HCF entered into a grain purchase contract with Associated Grain, Inc., a third-party grain buyer.[143]   The timing of this transaction is suspicious because it immediately followed the issuance of joint checks by Hollar & Greene, and HCF had always been a trucking company, while BFH LLC was the farming operation.   Nutrien asserts that the Halls began routing crop sales through HCF to avoid Nutrien's lien.

A particularly cogent perspective regarding intent in the context of conversion cases is as follows:

> The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured.  Consequently, the proper question is not whether the debtor intended that its secured creditor would  go  unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured.  If so, there is an intentional injury.[144]

Through this lens, and for the reasons set forth below, the Court finds that HCF and FP are liable for conversion.

As a starting point, the Court accepts the Halls' testimony that they moved funds to different affiliates with the intent to stay in business and pay bills.  However, even with such good intentions, courts have found similar conduct to constitute conversion.[145]  Although the

---

[142] Id.
[143] Pl.'s Ex. 406.13.
[144] ABF, Inc. v. Russell (In re Russell), 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001);  see also, Ferraro v. Ballard (In re Ballard), 2001 Bankr. LEXIS 1661, at *35-37 (Bankr E.D. Va. July 17, 2001).
[145] In re Scurlock, 1987 U.S. Dist. LEXIS 3969 (N.D. Fla. Apr. 1, 1987); In re Clark, 50 B.R. 122 (Bankr. D.N.D. 1985).

Halls had the admirable goal of remaining in business, they actively endeavored to avoid Nutrien's lien, and the redirection of crop sales resulted in damages to Nutrien.[146]

In support of its position, Nutrien presented evidence showing that Associated Grain paid $205,705.69 to HCF for grain produced by BFH LLC.[147]  Also, despite testifying that HCF never farmed or produced grain, Mrs. Hall failed to offer an explanation as to why grain checks were paid to HCF in 2018.[148]  Based on the evidence, the Court finds these payments should have been issued as joint checks to Nutrien and BFH LLC, and that HCF is therefore liable for conversion in the amount of $205,705.69.

> B.    *HCF and Produce Sales Entry on 2018 Tax Return*

Next, the Court considers the testimony of Mr. McDonald.[149]  HCF produced QuickBooks records to Nutrien that were made available to Mr. McDonald for his analysis.[150] Mr. McDonald testified that although an accounting entry shows $123,211.00 in produce sales were run through HCF in 2018, that amount was not reflected as revenue on HCF's 2018 tax return.[151]  Notwithstanding his access to the HCF QuickBooks records, Mr. McDonald could not offer any further specifics regarding the $123,211.00 in produce sales.  Given the lack of

---

[146] Despite the Halls' testimony that BFH LLC was shutting down, they continued BFH LLC's same business operations through other entities. For example, Mrs. Hall testified that proceeds from BFH LLC's 2018 crop sales were placed into HCF bank accounts.  Day 3 Trial Transcript, p. 122, ll. 5-9.

[147] Pl.'s Ex. 97.54; see also Pl.'s Ex. 3.

[148] Mrs. Hall acknowledged in her testimony that the grain was produced by BFH LLC, and the grain checks should have been paid to BFH LLC. Pl.'s Ex. 97, pp. 307-08.

[149] Based on his testimony and report, $1,650,030 was reported as crop sales for BFH LLC on the Halls' 2018 tax return. Pl.'s Ex. 509, p. 22; Day 2 Trial Transcript, p. 84.

[150] Day 2 Trial Transcript, p. 54, ll. 1-4; Motion for Sanctions, n. 4 (Doc. 321) ("Nutrien obtained QuickBooks records for Holden's Creek, Farm Properties, and Spuddog.  Accordingly, Nutrien does not seek relief against those entities related to their Quickbooks records.").

[151] Pl.'s Ex. 112.99, p. 8 (Halls' 2018 Tax Return includes HCF Schedule C); see also Day 2 Trial Transcript, pp. 82-85.

additional clarity, the Court will not hold HCF liable for conversion on the entry reflecting $123,211.00 in produce sales.[152]

C.    _Clam Shell Sales in relation to BFH LLC_

The testimony and evidence reflect that clam shell sales were deposited in various accounts over the years.  Nutrien did not show a pattern of which entity these sales were run through, and also failed to offer evidence or effectively argue that the sales should be covered within the scope of the BFH LLC Security Agreement.[153]   Therefore, the Court finds that because the clam shells were not part of Nutrien's collateral, such sales proceeds cannot provide liability for conversion, or liability for any of Nutrien's other claims.[154]

D.    _Funds Allegedly Misdirected by Farm Properties_

Mr. McDonald testified that FP improperly retained $548,506.00 in misdirected funds, which were BFH LLC collateral, that should have been paid to Nutrien.[155]   Upon review, the Court finds that most of these funds, in the amount of $488,536.00, arose in 2017, _prior_ to Nutrien declaring a default against the Halls.  Therefore, the Court finds that Nutrien did not have an immediate right to possession of the 2017 funds, and FP is only liable for conversion of the 2018 and 2019 misdirected funds, in the amount of $59,970.00.

---

[152] Importantly, the Court granted an adverse inference against certain defendants as a discovery sanction.  This adverse inference did not apply to HCF as Nutrien received Quickbooks records for FP and HCF.  Day 2 Trial Transcript, McDonald Testimony, p. 54, ll. 1-4; Doc. 321, n. 4 ("Nutrien obtained QuickBooks records for Holden's Creek, Farm Properties, and Spuddog.  Accordingly, Nutrien does not seek [discovery sanctions] against those entities related to their Quickbooks records.").

[153] Clam shells were clearly not covered under the BFH LLC Security Agreement.  See Pl.'s Ex. 23.

[154] The Court also notes that the equipment for the clam shell business had been titled under FP's name since 2015. Pl.'s Ex. 52, p. 63.

[155] Pl's Ex. 509, p. 17; Day 2 Trial Transcript, p. 67.

E.    *Crop Insurance Received by Farm Properties*

Nutrien argues that FP is liable for conversion based on 2018 crop insurance proceeds it received in the amount of $765,013.00 that belonged to Benny Hall and/or BFH LLC.[156] Upon review, however, the Court finds the majority of funds received by FP were immediately transferred to BFH LLC, and that FP is only liable for conversion of the $290,692.00 in proceeds that were not transferred to BFH LLC.[157]

In reaching this conclusion, the Court notes Mrs. Hall's testimony that upon its receipt of the $765,013.00 in crop insurance proceeds, FP promptly transferred $442,000.00 to BFH LLC.[158] However, FP also directly and indirectly transferred $290,692.00 to H&M Farms, which Mr. Hall has a 60% ownership interest in.[159] FP then used the remaining funds to pay bills, primarily on secured farming equipment.

Simply put, the insurance proceeds belonged to BFH LLC and were collateral of Nutrien, which had the immediate right to possess these proceeds.  Notably, Mrs. Hall acknowledged in her testimony that the funds belonged to BFH LLC, and that "Nutrien probably had a lien on [the insurance proceeds]."[160]  However, as set forth above, 100% of the proceeds did not go to BFH LLC, or alternatively, jointly to BFH LLC and Nutrien as an additional insured.[161]  Instead, proceeds totaling $290,692.00 were deposited with FP then transferred to pay another affiliate (H&M Farms), either directly or through an affiliated intermediary (BFH Produce).  Because damages for conversion are calculated based on the

---

[156] The crop insurance proceeds totaled $975,224, minus the insurance premium of $210,212.  Pl.'s Ex. 341.16.
[157] See In re Scurlock, 1987 U.S. Dist. LEXIS 3969 (N.D. Fla. Apr. 1, 1987); In re Clark, 50 B.R. 122 (Bankr. D.N.D. 1985).
[158] Pl.'s Ex. 52.19, p. 8.
[159] FP directly transferred $75,000 to H&M Farms, as well as indirectly transferred another $215,692 to H&M Farms through BFH Produce. Day 2 Trial Transcript, p. 70.
[160] Day 4 Trial Transcript, p. 60.
[161] The Security Agreement required the Halls to maintain crop insurance and name Nutrien as additional insured. Pl.'s Ex. 23.

value of the collateral at the time of conversion, the Court finds FP liable for conversion in the amount of $290,692.00.[162]

### F. *Mrs. Hall's Liability for Conversion*

The Court now considers Mrs. Hall's liability in relation to the above conversion claims. With respect to ownership, Mrs. Hall was the sole owner of HCF, and she and Mr. Hall also owned FP as tenants by the entirety. Importantly, Mrs. Hall was responsible for the financial management and bookkeeping of the Hall entities, including HCF and FP.[163] Based on her role and authority, the Court finds Mrs. Hall liable for the tortious acts of HCF and FP, consistent with the above rulings.[164]

---

[162] Sims v. Tyrer, 96 Va. 14, 16 (1898) (A party damaged by sale of misappropriated property shall recover based on the value "at the date of the sale made by the wrong-doer."); see also Johnson v. Davis (In re Davis), 262 B.R. 663, 673 (Bankr. E.D. Va. 2001) ("When collateral is converted as it was here, the usual measure of an award of damages is the retail value of the collateral at the time the conversion occurred . . . ."); In re Scurlock, Adv. No. 84-9057, 1987 U.S. Dist. LEXIS 3969 (N.D. Fla. Apr. 1, 1987) (measured liability for conversion based on crop proceeds used for business expenses); In re Clark, 50 B.R. 122 (Bankr. D.N.D. 1985) (debt for conversion nondischargeable in the amount of proceeds of potato crop sold without authority including portion used for the farming operation).

[163] Pl.'s Exhibit 229, B. Hall Dep., p. 36, ll. 9-13 (testifying that the work he did for BFHS included "[e]verything that needed to be done, except for bookkeeping"); id. at p. 37, ll. 9-23 (testifying that Mrs. Hall "tried to make sure we were getting paid the right amounts for whatever we had sold" and kept the books); id. at p. 40, ll. 7-9 (testifying that Mrs. Hall communicated with the Halls' accountant on behalf of BFHS); Ex. 406, G. Stewart Dep., p. 25, ll. 15–18 (testifying that he and Mrs. Hall were responsible for billing and recordkeeping for the farming operations); id. at p. 38, ll. 22-24 ("I know [Mrs. Hall] moved money around from time to time because the cash pressure from the merchant cash advances was killing them."); id. at pp. 59-60 (testifying that only Mrs. Hall transferred funds between the Hall Entities); id. at p. 66, ll. 12-25 (testifying that Mrs. Hall would move BFHS's funds among the Hall Entities' accounts); Ex. 341, Leatherbury Dep., p. 18, ll. 13-17 (testifying that Mrs. Hall "helped the office, did bookkeeping, helped pay the bills, that sort of thing" for the farming operation); Ex. 414, J. Baylis Dep., at pp. 12-13 (testifying that she would not make payments or transfers for HCF, Eastern Shore, or BFHS without obtaining authorization from Mrs. Hall); id. at p. 27, ll. 4-13 (testifying that Mrs. Hall "did any bank transfers" between BFHS and HCF).

[164] Trans-Radial Sols., LLC v. Burlington Med., LLC, 2019 U.S. Dist. LEXIS 131711, *13, n. 1 ("Members or managers of LLCs may also be individually liable for any misconduct in which they are 'personally engaged.'") (quoting Bennett v. Zydron, No. 2:17-CV-92, 2017 U.S. Dist. LEXIS 154539, 2017 WL 9478505, at *5 (E.D. Va. Aug. 17, 2017), report and recommendation adopted, No. 2:17-CV-92, 2017 U.S. Dist. LEXIS 154692, 2017 WL 4176972 (E.D. Va. Sept. 21, 2017) (finding that member/manager of LLC could be personally liable under § 1125(a) of the Lanham Act if he personally engaged in false association or false advertising).

### IV.    Voluntary Conveyance Under Virginia Code Section 55.1-401 (Pled Against Mr. Hall, Mrs. Hall, HCF, FP, Spuddog and Other Hall Entities) – Count III of 2020 Action

Nutrien asserts various voluntary conveyance claims against the Halls and their business entities based on the argument that BHF LLC was insolvent at the times of the relevant transfers. In analyzing these issues, the Court looks to Va. Code § 55.1-401, which provides, "[u]nder a theory of constructive fraudulent transfer, a 'voluntary conveyance is void as to a prior creditor' when [the following] three elements are met [:]"[165]

> (1) the transfer was not made upon consideration deemed valuable in law;
> (2) the transfer was made by an insolvent transferor, or by a transferor who was rendered insolvent by the transfer; and
> (3) the transferor's debt to the creditor was contracted before the time of the transfer.[166]

At trial, Mr. McDonald testified that BFH LLC was insolvent as of March 31, 2018, December 31, 2018, and December 31, 2019.[167]   These insolvency dates do not align with Nutrien's voluntary conveyance claim as to the August 2017 transaction for $338,000.00 from BFH LLC to purchase equipment in FP's name because that transaction occurred prior to the insolvency dates testified to by Mr. McDonald.[168]   Additionally, the remainder of Nutrien's voluntary conveyance claims centered around "misdirected funds" fail to form the basis of voluntary conveyance claims to the extent such transactions occurred prior to March 31, 2018.

Nutrien also alleges that the "evidence shows that the Constructively Fraudulent Transfers were transfers of property from BFHS made for no consideration to insiders of BFHS while Nutrien was a creditor of BFHS and BFHS was insolvent."[169]   Upon review, the Court

---

[165] U.S. v. Kotzev, 2022 U.S. Dist. LEXIS 12697, at *6 (E.D. Va. Jan. 24, 2022) (quoting Hudson v Hudson, 249 Va. 335, 340 (1995) (citing Va. Code. § 55.1-401)).
[166] Id.
[167] Day 2 Trial Transcript, p. 55.
[168] Id.
[169] Pl.'s Post-Trial Brief on Liability, p. 16.

finds that Nutrien failed to prove that BFH LLC received no consideration for most of the transfers. Specifically, Mrs. Hall's testimony that any "misdirected funds" were either transferred to BFH LLC or were used by affiliates to pay BFH LLC's creditors is supported by the documentary evidence.[170] Therefore, BFH LLC received consideration for the "so called" misdirected funds because it either received payment of its business expenses, received the funds directly, or otherwise benefited from the use of equipment or real estate owned by the Halls or their other entities.[171] Accordingly, Nutrien did not carry its burden as to the first element of its voluntary conveyance claims.

> **V.   Fraudulent Conveyance Under Virginia Code Section 55.1-400 (Pled Against Mr. Hall, Mrs. Hall, HCF, FP, Spuddog, and Other Hall Entities) – Count IV of 2020 Action**

Next, the Court considers the various fraudulent conveyance claims against the Halls and their business entities. The four elements of a claim for fraudulent conveyance under Virginia Code § 55.1-400 are:

1) Conveyance of property to another;
2) Done with intent to hinder, delay, or defraud;
3) Affecting a creditor, purchaser, or other person; and
4) Depriving them of what they are or may be lawfully entitled to.[172]

As recognized by the Supreme Court of Virginia, fraudulent conveyances are transactions "done with vicious intent."[173] A creditor must prove by "clear, cogent and convincing evidence, that: 1) the [transferor] intended to delay, hinder or defraud his creditors,

---

[170] See, e.g., Day 4 Trial Transcript, p. 62, ll. 13-17.

[171] As previously stated, examples include a new roof the Halls paid for on real property they owned, which also served as their business office, and funds paid to a creditor for a vehicle titled to Mr. Hall but driven as a service truck by an employee of BFH LLC. Day 3 Trial Transcript, p. 111-12; Pl.'s Exhibit 52, p. 165; Day 4 Trial Transcript, p. 101, ll. 9-11.

[172] 1 Virginia Remedies § 48-2 (citing Efessiou v. Efessiou, 41 Va. Cir. 142, 145 (Fairfax Co. 1996)).

[173] La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC, 294 Va. 243, 253 (2017) (quoting Davis v. Turner, 45 Va. (4 Gratt.) 422, 429 (1848)).

and 2) the [transferee] had notice of the transferor's fraudulent intent."[174]    The second requirement is clearly met because the Halls controlled both the transferor (BFH LLC) and the transferees.

Because debtors are unlikely to candidly admit to fraudulent intent, creditors often must meet their evidentiary burden through circumstantial evidence.    Courts recognize specific examples of circumstantial evidence termed "badges of fraud," which include:

> (1) retention of an interest in the transferred property by the transferor;
> (2) transfer between family members for allegedly antecedent debt;
> (3) pursuit of the transferor or threat of litigation by his creditors at the time of the transfer;
> (4) lack of or gross inadequacy of consideration for the conveyance;
> (5) retention or possession of the property by transferor; and
> (6) fraudulent incurrence of indebtedness after the conveyance.[175]

"Proof of a single badge of fraud '*may be sufficient* to stamp a transaction as fraudulent.'"[176] To determine if a transaction should be voided as a fraudulent conveyance pursuant to Virginia Code § 55.1-400, a court should consider the "peculiar facts and circumstances" of each case.[177]  If the transferee is complicit with the transferor in effecting a fraudulent transfer, consideration is no defense.[178]  As stated by the Fourth Circuit "[w]ithout the bona fides on the part of the grantee, the valuable consideration has no effect in rescuing the transaction from the literal terms and spirit of the Statute."[179]  By February or March of

---

[174] Id. at 254.

[175] Fox Rest Assocs., L.P. v. Little, 282 Va. 277, 285, 717 S.E.2d 126, 132 (2011).

[176] White v. Llewellyn, 299 Va. 658, 665 (2021) (quoting Hickman v. Trout, 83 Va. 478, 491 (1887)).

[177] La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC, 294 Va. 243, 254 (2017) (quoting Temple v. Jones, Son & Co., 179 Va. 286, 298 (1942)).

[178] National Carloading Corp. v. Astro Van Lines, Inc., 593 F.2d 559, 563 (4th Cir. 1979) (transferee had knowledge of transferor's intent where transferee and transferor were both owned by the same shareholder).

[179] Id. (quoting Garland v. Rives, 4 Randolph (25 Va.) 282, 301 (1826)); see also Va Code § 55.1-400 ("This section shall not affect the title of a purchaser for valuable consideration, *unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.*") (emphasis added).

2018, the Halls and BFH LLC certainly faced collection action and the threat of litigation by Nutrien. Thus, by that time, one of the badges of fraud was present.

The Court first considers the transfer from BFH LLC to FP, in the amount of $338,000.00 that occurred in August of 2017. Notably, this transfer occurred *prior* to the threat of litigation, and BFH LLC did not retain any interest in the funds (which were used by FP to purchase equipment).[180] Therefore, the Court finds that Nutrien did not make a prima facie showing of a fraudulent conveyance as to this transaction.

However, the transfers by the Halls to pay for BFH LLC's business expenses that occurred after February of 2018 require a closer analysis because arguably these funds may qualify as "retention of an interest" sufficient to constitute a badge of fraud. If the Court determines that sufficient badges of fraud exist to shift the burden to the Halls, then the Defendants must prove the bona fides of the contested transactions through "strong and clear evidence."[181] The Court will consider each of the transactions below.

A.   *Contrel Brown Transactions*

The evidence produced at trial supports the Hall's position that the transactions with Contrel Brown occurred because they lacked sufficient funds to farm their available land. Specifically, the Halls had already agreed to lease certain farmland, and therefore the mere act of sub-leasing this land to Contrel Brown, who is not an affiliate, does not transform these transactions into fraudulent ones. Accordingly, the Court finds that the transactions with Contrel Brown were not fraudulent.

---

[180] To the extent that Nutrien objects to FP's ownership of the equipment as opposed to BFH LLC, the Court notes that the BFH LLC Security Agreement did not encumber equipment of BFH LLC. Pl.'s Ex. 23.
[181] White, 299 Va. at 668-70 (2021).

B.      *HCF Transactions with Associated Grain*

The Court next considers the transactions in which the Halls sold grain to Associated Grain through their trucking company, HCF.   These transactions were unusual in that Associated Grain historically purchased grain from BFH LLC, directly or through ES Grain.[182] Further, Mrs. Hall could not explain why the grain was sold to a third-party buyer through HCF, and the timing of the atypical contract between HCF and Associated Grain coincided with Nutrien taking collection action.   This sequence of events leads the Court to believe that the Halls structured these grain sales to avoid Nutrien's lien. The Court will therefore avoid these transfers, totaling $205,705.69, from BFH LLC to HCF as fraudulent transfers.

Ordinarily, the remedy under Va. Code § 55.1-400 is to merely avoid the fraudulent transfer.   However, if the property transferred consists of liquid funds or otherwise cannot be identified in any form, then the court may enter an *in personam* judgment.[183]   In this case, the transferor and transferee were controlled by the same people, and the fraudulent transfer consisted of liquid funds.   Further, the contract appears to be structured with the intention of avoiding Nutrien's lien rights by selling through HCF rather than BFH LLC.   Based on the foregoing, the Court finds it appropriate to enter an *in personam* judgment against HCF in the amount of $205,705.69.

C.      *Spuddog Transfers*

With respect to the Spuddog transfers, the evidence reflects that the Halls transferred their real property for the purpose of obtaining a business loan from WBL.[184]   Further, the transfers occurred well before the threat of litigation from Nutrien, and Nutrien never had a lien

---

[182] ES Grain was an affiliate acting as a seller of BFH LLC's grain.
[183] Price v. Hawkins, 247 Va. 32, 37 (1994) (finding creditor left without an effective remedy if fraudulent transfer of cash were simply avoided without entry of an *in personam* judgment against the transferees).
[184] See supra p. 12 and accompany notes.

on the real property transferred.  Therefore, the Court finds that Nutrien failed to establish badges of fraud and accordingly did not make a prima facie showing of a fraudulent transfer with respect to Spuddog.

      D.    _FP Misdirected Funds_

The Court next considers the allegation by Nutrien that over $500,000.00 in funds were misdirected via transfers from BFH LLC to FP between 2017 and 2019 (the "FP Misdirected Funds"), and that such funds constitute fraudulent transfers.[185]

In support of its position, Nutrien relies on the findings by Mr. McDonald who "calculated that [] the net amount of $548,506.00 in [BFH LLC] funds deposited into FP's deposit account in 2017 and 2019 was retained by FP."[186] Although Mr. McDonald testified extensively on the FP Misdirected Funds, the Court finds his testimony lacks the degree of specificity necessary to reach a finding that the funds were fraudulently transferred.[187]  For example, despite having access to the bank statements of the relevant entities,[188] his testimony was general in nature and only offered approximate amounts of transactions from 2016 to 2020.[189]  Further, despite analyzing voluminous bank records, Mr. McDonald calculated the net amount almost entirely based on the style of entries made by the Halls or their accountant.[190] Therefore, while Mr. McDonald's analysis was compiled from a sufficient quantity of data, he did not effectively connect his analysis with his conclusions.  The Halls also presented credible evidence that, to the extent any funds were "misdirected," such funds were used for business

---

[185] Pl.'s Post-Trial Brief on Liability, pp. 15, 18.
[186] Pl.'s Post-Trial Brief on Dischargeability, p. 12.
[187]  The Court allowed Mr. McDonald's expert report for demonstrative purposes only.
[188] Mr. McDonald also had access to QuickBooks records for FP, HCF and Spuddog.
[189] Day 2 Trial Transcript, pp. 64-67.
[190] See e.g., Day 2 Trial Transcript, p. 68 (Mr. McDonald stated "for each of the years [2017-2019] going back to what I previously said, was deposits that were identified and recorded within the due to/due from, which is an indication that those funds really should have gone to Benny F. Hall & Sons, LLC to begin with").

expenses and not personal gain.[191]    Additionally, most of the FP Misdirected Funds were generated in 2017, prior to Nutrien threatening litigation and declaring a default.[192]

Based on the above, the Court finds that Nutrien did not offer "clear, cogent, and convincing evidence" necessary to convince the Court that the FP Misdirected Funds were transferred with intent to hinder, delay, or defraud Nutrien, and the transfers therefore fail to meet the criteria for fraudulent transfers.

E.    *Perdue Payment*

In 2019, Mrs. Hall received a payment of $116,100.00 from Perdue Foods, LLC ("Perdue"),[193] related to a buyout of a contract with Perdue for raising and selling chickens.[194] The Halls owned the real estate and the chicken houses affixed to the real estate in their personal names.[195]  Further, Nutrien did not have a lien on chickens owned by BFH LLC,[196] and the sole evidence offered in support of its position was Mrs. Hall's testimony regarding whether the chicken operation was historically run in her and her husband's personal names or through BFH LLC.  Ultimately, the Court finds that Nutrien fell far short of providing "clear, cogent, and convincing evidence" that the Perdue payment was made with intent to avoid Nutrien's lien.

F.    *Crop Insurance Proceeds*

Based on the Court's prior analysis,[197] the transfer of $290,692.00 of the crop insurance proceeds received by FP and then transferred to H&M Farms constitutes a fraudulent transfer. The remainder of the crop insurance proceeds were transferred to BFH LLC or used to pay for

---

[191] Although Mr. McDonald claims to have accounted for valid business expenses, his testimony did not convince the Court on this point.
[192] Pl.'s Exs. 30, 509.
[193] Pl.'s Ex. 189.160.
[194] Mrs. Hall testified that the contract with Perdue was in the Halls' personal names.  Pl.'s Ex. 189, p. 573.
[195] Day 3 Trial Transcript, pp. 105-106 (referring to Mrs. Hall's deposition testimony at Pl.'s Ex. 189, pp. 571-574).
[196] Pl.'s Ex. 23.
[197] See supra pp. 27-28.

business expenses related to the farming operation.  Therefore, the remaining funds were not transferred with the intent to hinder, delay or defraud.

Accordingly, the Court will avoid the transfer to FP to the extent of $290,692.00.  Ordinarily, the remedy under Va. Code § 55.1-400 is to avoid the fraudulent transfer.  However, as the Court previously noted, if the property transferred consists of liquid funds or otherwise "cannot be identified in any form," then the court may enter an *in personam* judgment.  In this case, the transferor and transferee were controlled by the same persons, and the fraudulent transfer consists of liquid funds.  When FP received the crop insurance proceeds on December 5, 2018, Nutrien had already commenced collection efforts ten months earlier in February of 2018.[198]  Based on the foregoing, the Court finds it appropriate to enter an *in personam* judgment against FP in the amount of $290,692.00.[199]

### VI.   Constructive Trust/Equitable Lien (Pled Against Mr. Hall, Mrs. Hall, BFH LLC, HCF, FP, and the Other Hall Entities) – Count V of 2020 Action

Nutrien's premise for Count V relies on what obligations managing members of an insolvent LLC owe to creditors, which is essentially the same argument raised by Nutrien in Count I.  As previously discussed, in Virginia, while such an obligation arises for corporate officers, the same duty does not arise in the context of an LLC.  Further, the Court finds that Nutrien failed to prove self-dealing because, despite mountains of documentary evidence, numerous depositions, and four days of testimony, Nutrien failed to identify funds that personally benefited the Halls.  The transactions primarily benefitted the farming operations or

---

[198] Nutrien did not obtain the Partial Final Judgment until May of 2019.  Pl.'s Ex. 229.5.
[199] Price v. Hawkins, 247 Va. 32, 37 (1994) (finding creditor left without an effective remedy if fraudulent transfer of cash were simply avoided without entry of an *in personam* judgment against the transferees).

otherwise qualified as business expenses and only tangentially benefitted the Halls personally.[200]  Based on the Court's finding in Count I, the Court will likewise deny Count V.

### VII.    Rights of a Secured Party Under the Uniform Commercial Code (Pled Against Mrs. Hall, HCF, FP, Spuddog and the Other Hall Entities) – Count VI of 2020 Action

For Count VI, Nutrien relies on its argument contained in Count II (Trover/Conversion).[201]  As its remedy under Count VI, Nutrien requests a judgment for the "Converted Funds."[202]  Thus, the Court finds in favor of Nutrien as to Count VI *solely* as to those parties found liable under Count II, and consistent with the limited extent Nutrien prevailed under Count II.

### VIII.    Assumpsit (Pled Against Mrs. Hall, HCF, FP, Spuddog and other Hall Entities) – Count VII of 2020 Action

In support of its claim for assumpsit, Nutrien argues that the "[c]onverted Funds constitute proceeds from Nutrien's Collateral to which, but for the mistake or fraud, Nutrien had an unquestioned right."[203]  Nutrien further argues that "equity and good conscience require that such money should not be retained."[204]  Based on the evidence, the Court finds that Nutrien failed to prove that the Halls "retained" the funds.  Nutrien did not effectively contradict the Halls' testimony that any misdirected funds were paid to other creditors or were spent on legitimate business expenses.

Because Count VII seeks judgment based on the "Converted Funds," the scope of which depends upon the Court's ruling on Count II, the Court finds in favor of Nutrien only as to those

---

[200] See, e.g., Day 4 Trial Transcript, p. 101, ll. 9-11 (Funds were paid to Chase Auto Finance for a truck titled in Mr. Hall's personal name.  Although the vehicle was titled in Mr. Hall's name, the vehicle was a service truck driven by a farm manager employed by BFH LLC).
[201] Pl.'s Post-Trial Brief on Liability, ¶ 41, n. 79 (citing to ¶ 23 and associated endnotes).
[202] Id. at ¶ 42.
[203] Id. at ¶ 44.
[204] Id.

parties found liable under Count II, and consistent with the limited extent Nutrien prevailed under Count II.

### IX.    Unjust Enrichment (Pled Against Mrs. Hall, HCF, FP, Spuddog, and the Other Hall Entities) – Count VIII of 2020 Action

The Court next considers Nutrien's claim for unjust enrichment against Mrs. Hall, HCF, FP and Spuddog.  To succeed on this claim Nutrien must show that: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value."[205]

The existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment."[206]  The evidence reflects that the contract between Nutrien and BFH LLC defined the terms of their business relationship.  Therefore, Nutrien's claim for unjust enrichment is inapposite under the circumstances.[207]  Accordingly, the Court will deny Nutrien's claim under Count VIII.

### X.    Joint venture and/or Partnership (Pled Against Mrs. Hall, HCF, FP, Spuddog, BFH Trucking and the Other Hall Entities) – Count IX of 2020 Action

Nutrien alleges that certain actions taken by Mrs. Hall, HCF, FP, Spuddog, and BFH Trucking resulted in a joint venture.  The Court disagrees.  "Joint ventures are not established by operation of law but by contracts, expressed or implied, between the parties."[208]  Because no express contracts existed between the Hall Entities, any joint venture would have to be based

---

[205] James G. Davis Constr. Corp. v. FTJ, Inc., 298 Va. 582, 597 (2020).
[206] Id. at 592.
[207] See id.
[208] Wells v. Whitaker, 207 Va. 616, 626 (1966) (citing Smith, Adm'r v. Grenadier, 203 Va. 740, 744 (1962)).

on an implied contract.  Importantly, similar to partners, joint venturers are liable for each other's debts incurred in furtherance of the joint venture.[209]

In support of Count IX, Nutrien relies on Virginia Code § 50-73.96, titled "Partner's liability," and argues that "Mrs. Hall transferred significant funds between the Hall Entities as necessary to pay the Hall Entities' various obligations."[210]  Specifically, § 50-73.96 provides in pertinent part:

> A.  Except as otherwise provided in subsection B or subsection C, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law.
>
> B.  A person admitted as a partner into an existing partnership is not personally liable for any partnership obligation incurred *before* the person's admission as a partner.

Va. Code Ann. § 50-73.96 (West) (emphasis added).   Notably, § 50-73.96(B) is critical to the Court's analysis because the Virginia Indebtedness *predates* events that Nutrien asserts resulted in the joint venture or partnership.[211]

With respect to Nutrien's contracts with the Halls and BFH LLC, the loan documents were executed in February of 2013 and January of 2014. [212]  The actions that resulted in the alleged joint venture occurred many years later.  Because newly admitted partners cannot be held responsible for pre-existing debts,[213] Nutrien's claim for joint venture or partnership fails, and the Court will deny Nutrien's claim under Count IX.[214]

---

[209] <u>Roark v. Hick</u>, 234 Va. 470, 475 (1987); Va. Code § 50.73-96.
[210] Pl.'s Post-Trial Brief on Liability, p. 25.
[211] Nutrien only seeks to impose liability under Count IX for the Virginia Indebtedness.
[212] Pl.'s Ex. 22; Day 1 Trial Transcript, pp. 56-58; Pl.'s Ex. 26-27.
[213] Likewise, any money transferred by ES Grain and HCF to cover equipment payments to Loeb does not constitute a joint venture because the Loeb Promissory Note and Security Agreement were executed in February of 2017. Pl.'s Ex. 52, pp. 146-47; Pl.'s Ex. 52.35.
[214] Va. Code § 50.73-96(B).

XI.    **Piercing the Corporate Veil and Alter Ego (Pled Against Mr. Hall, Mrs. Hall, HCF, FP, Spuddog, BFH Trucking, and the Other Hall Entities) – Count X of 2020 Action**

Nutrien seeks to pierce the corporate veil to hold Mrs. Hall, HCF, FP, Spuddog, and BFH Trucking liable for the Virginia Indebtedness.[215]  Generally, a creditor is required to clear an "extremely high bar" to succeed on a corporate veil-piercing claim.[216]

In determining whether to pierce the corporate veil, Virginia courts look at several factors, including "whether the individual siphoned business assets into their own pockets."[217] Nutrien argues that this factor, among others, is present.  The Court disagrees.

In support of its position, Nutrien asserts that the Halls "siphoned business assets into their personal pockets by . . . [making payments on] vehicles owned by the Halls."[218]  Although Nutrien points to other examples, these have already been rejected by the Court.[219]

As the Court has already recognized, the Halls took very little, if any, salary during the relevant time periods[220] and injected their personal funds into the businesses.  Mrs. Hall credibly testified that none of the allegedly misdirected funds were used to pay back these contributions of personal funds.[221]  Further, although numerous inter-company transfers occurred, many of these transfers were into, not out of, BFH LLC.  Based on the foregoing, the Court finds that the Halls did not transfer business assets into their personal pockets.

Virginia courts also look at whether business formalities were observed.  The evidence reflects that the Halls maintained separate bank accounts, books, and records for the different

---

[215] Pl.'s Post-Trial Brief on Liability, ¶ 59.
[216] In re Nilhan Fin., LLC, 652 B.R. 381, 391 (Bankr. M.D. Fla. 2023) (applying Florida law on a claim for reverse veil-piercing).
[217] C.F. Trust, Inc. v. First Flight Ltd. P'ship, 140 F. Supp. 2d 628, 643 (E.D. Va. 2001).
[218] Pl.'s Post-Trial Brief on Liability, ¶ 56.
[219] See, e.g., supra notes 134, 174, 201 (payments made on a truck owned by the Halls personally was a service truck driven by a farm manager employee).
[220] Day 4 Trial Transcript, pp. 88-89.
[221] Id. at p. 89.

entities.[222]   Separate tax returns were prepared for ES Grain and BFH Trucking, and the Halls'

joint personal tax return delineated the separate businesses for the remaining entities.[223]   The

Halls maintained a record of the inter-company transfers and other transactions on QuickBooks.

Based on the foregoing, the Court finds that the Halls generally observed corporate formalities

demonstrating that the entities were separate and distinct businesses.

The Virginia Supreme Court has held that "[p]iercing the corporate veil is justified when

the unity of interest and ownership is such that the separate personalities of the corporation and

the individual no longer exist and to adhere to that separateness would work an injustice."[224]

As discussed above, the Halls sufficiently followed business formalities to maintain the

separateness of the entities.   Additionally, the Court finds that piercing the veil would work an

injustice because holding FP liable for the Virginia Indebtedness could force the sale of real

property in Virginia and Florida that, while owned by FP, was purchased with funds *wholly*

unrelated to the farming operation.[225]   Accordingly, the Court will deny Nutrien's claim under

Count X.

## XII.   Successor Liability (Pled Against HCF, FP, and the Other Hall Entities) – Count XI of 2020 Action

Nutrien seeks to hold HCF and FP liable for the Virginia Indebtedness based on a claim

of successor liability.   Under Virginia law, to prove successor liability Nutrien must show that:

> (1) the purchasing corporation expressly or impliedly agreed to assume such
> liabilities, (2) the circumstances surrounding the transaction warrant a finding
> that there was a consolidation or *de facto* merger of the two corporations, (3) the
> purchasing corporation is merely a continuation of the selling corporation, *or* (4)
> the transaction is fraudulent in fact.[226]

---

[222] Pl.'s Exs. 97.59, 112.90, 112.91, 285.73, 406.5, 491.

[223] See Pl's Exs. 112.95-112.102, 285.78, 341.80-341.91.

[224] C.F. Trust, Inc. v. First Flight Ltd. P'ship, 266 Va. 3, 10 (2003).

[225] The real property consists of a rental house in Virginia, which was gifted to FP by Mr. Hall's uncle, and a residence in Florida purchased with stock funds inherited by Mrs. Hall from her mother. Pl.'s Exhibit 52, pp. 55-56.

[226] Harris v. T.I., Inc., 243 Va. 63, 70 (1992).

While the first three grounds may be proven by a preponderance of the evidence, the fourth ground must be shown by clear and convincing evidence. Nutrien did not carry this heightened burden under the fourth ground, and the Court will solely discuss the first three grounds.

As discussed below, Nutrien did not establish any of the remaining three criteria for successor liability. Specifically, the first and third grounds involve the sale of one company to another.[227] However, Nutrien's allegations as to this count center around transfers of business lines that occurred in 2018. Because no business sale occurred during this time frame, the facts do not support the first or third grounds for a successor liability claim. As to the second ground, this is also not satisfied because it focuses on a consolidation or de facto merger of two corporations, and the Court has already found that the Hall Entities sufficiently maintained separate identities. Accordingly, Nutrien failed to prove any of the first three grounds by a preponderance of the evidence. Therefore, the Court will deny Nutrien's claim for successor liability under Count XI.[228]

### XIII.   Tortious Interference with Contract (Pled Against Mrs. Hall, HCF, and FP) – Count XII of 2020 Action

Nutrien alleges that the Halls engaged in tortious actions, and that most of these actions occurred in 2018 or later.[229] Under Virginia law the elements of tortious interference with a business relationship are: (1) existence of business relationship or expectancy, with probability of future economic benefit to plaintiff; (2) defendant's knowledge of relationship or expectancy;

---

[227] See, e.g., LaBella Dona Skin Care, Inc. v. Belle Femme Enters., LLC, 294 Va. 243 (2017) (New business formed at time of cessation of old business, and new business purchased old business' assets at auction.); Harris v. T.I., Inc., 243 Va. at 66 (terminated business "sold virtually all of its assets" to new business through an asset purchase agreement, and new business held itself out as the successor of the old business).

[228] The Court also notes its previous findings that the clamshell business, Perdue Payment, and the farming by Contrel Brown do not warrant a finding of successor liability.

[229] See Pl.'s Post-Trial Brief on Liability, pp. 32-33 and evidence cited in footnotes 112-19.

(3) reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in relationship or realized the expectancy; and (4) damage to the plaintiff.[230]

Nutrien's business relationship with the Halls does not support Nutrien's argument. Notably, in early February of 2018, Nutrien had already declared a default and had no expectation that the business relationship would continue. Therefore, the third element is absent, and the Court will deny Nutrien's claim for tortious interference under Count XII.

### XIV.   Aiding and Abetting Breach of Fiduciary Duty, Tortious Interference with Contract and Conversion (Pled in the Alternative Against Mrs. Hall, HCF, and FP) – Count XIII of 2020 Action

Nutrien contends that Virginia courts recognize a cause of action for aiding and abetting a breach of fiduciary duty. However, Nutrien fails to provide definitive case law in support of this contention. Nutrien points to a Virginia Supreme Court case, which merely assumed, without deciding, that Virginia recognizes such a cause of action.[231] Because Nutrien does not provide, and the Court cannot locate, any clear case law that Virginia courts recognize a cause of action for aiding and abetting a breach of fiduciary duty, the Court will not recognize this cause of action here. Accordingly, the Court will deny Nutrien's claim under Count XIII.

### DISCHARGEABILITY COMPLAINT[232]

### I.   Count I – 11 U.S.C. § 523(a)(2) - Exception to Discharge for Money Obtained through Actual Fraud (Piercing the Corporate Veil)

Count One of the Dischargeability Complaint is contingent on liability under Count X of the 2020 Action, and the Court has already found that Mrs. Hall is not liable under that count. Therefore, there is no debt,[233] and Nutrien's claim under Count I will be denied.

---

[230] Adnet, Inc. v. Soni, 66 F. 4th 510, 518-19 (4th Cir. 2023).
[231] Halifax Corp. v. Wachovia Bank, 268 Va. 641, 660-62 (2004).
[232] The Court previously dismissed Count III brought under 11 U.S.C. § 523(a)(4).
[233] Husky Int'l Elecs., Inc. v. Ritz (In re Ritz), 832 F.3d 560, 562, 569 (5th Cir. 2016) (if there is no underlying debt then the question under § 523(a)(2)(A) becomes moot).

II.      **Count II – 11 U.S.C. § 523(a)(2) - Exception to Discharge for Money Obtained Through Actual Fraud (Fraudulent Conveyances)**

Count II of the Dischargeability Complaint is contingent on liability under Count IV of the 2020 Action, and the Court did not impose personal liability on Mrs. Hall under that count. Therefore, there is no debt, and Nutrien's claim under Count II will be denied.[234]

III.     **Count IV – 11 U.S.C. § 523(a)(4) - Exception to Discharge for Larceny**

Pursuant to 11 U.S.C. § 523(a)(4), "larceny is the fraudulent taking and carrying away of the property of another with intent to convert such property to his use without the consent of another."[235]  The evidence reflects that Mrs. Hall's initial control of Nutrien's collateral was legally within her rights as the managing member of BFH LLC.  Because Mrs. Hall's initial possession or control of the collateral was lawful, Nutrien does not possess a valid claim for larceny.[236]  Where a person comes into lawful possession of property and misappropriates the property, a creditor may hold a claim for embezzlement, not larceny.[237]  Therefore, the Court will deny the relief sought under Count IV.

IV.      **Count V – 11 U.S.C. § 523(a)(4) - Exception to Discharge for Embezzlement**

Next, the Court considers Nutrien's claim under the theory of embezzlement, which is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[238]  "To support a claim for embezzlement, the following specific elements must be demonstrated: '(i) property owned by

---

[234] Id.
[235] Ford v. Pupello (In re Pupello), 281 B.R. 763, 768 (Bankr. M.D. Fla. 2002).
[236] See In re Ebrahimpour, 2024 Bankr. LEXIS 657, at *12 (Bankr. M.D. Fla. Mar. 15, 2024) ("with larceny, the debtor wrongfully takes the property from someone else").
[237] Id. (discussing the difference between larceny and embezzlement).
[238] Moore v. United States, 160 U.S. 268, 269 (1895); see also MKL Enter. v. Hill (In re Hill), 2021 Bankr. LEXIS 2688, at *19 (Bankr. M.D. Fla. Sept. 30, 2021) (citing Ford v. Pupello (In re Pupello), 281 B.R. at 767).

another is rightfully in the possession of the debtor; (ii) the debtor appropriates the property for personal use; and (iii) the appropriation occurred with fraudulent intent or by deceit.'"[239]

Nutrien satisfies the first element because its property rights as lien holder are sufficient to establish that it owned the property which was rightfully in Mrs. Hall's possession.[240]  The second element is also satisfied because the Halls actively participated in the tortious conduct by transferring BFH LLC's funds to other companies they owned.[241]  Therefore, the Halls appropriated the collateral for their own use, and under the law they are not necessarily absolved from liability solely because they used the funds for business expenses or to pay creditors.[242]

With respect to third element, Nutrien is required to prove that Mrs. Hall had the requisite fraudulent intent which "may be inferred from surrounding circumstances and the conduct of the accused."[243]  Notably, once circumstantial evidence is presented of an intent to deceive, a debtor "cannot overcome that inference with an unsupported assertion of honest intent."[244]  "Instead, the court should consider whether the [debtor's] actions appear so inconsistent with [her] self-serving statement of intent that the proof leads th[e] court to disbelieve the debtor."[245]  Upon review, the Court finds the circumstantial evidence presented supports Nutrien's position that Mrs. Hall's actions are reflective of an intent to mislead for the

---

[239] In re Ebrahimpour, 2024 Bankr. LEXIS 657, at *12 (Bankr. M.D. Fla. Mar. 15, 2024) (quoting In re Gross, 639 B.R. 255, 259-60 (Bankr. N.D. Ga. 2022)).

[240] See In re Tarrant, 84 B.R. 831 (Bankr. M.D. Fla. 1988) (finding debts nondischargeable for embezzlement based on the debtor using the proceeds from the sale of mobile homes to fund the business rather than paying floorplan lender); In re Imbody, 104 B.R. 830 (Bankr. N.D. Ohio 1989) (holding debtors liable for embezzlement under § 523(a)(4) where they used crop proceeds to pay the I.R.S.).

[241] In re Clark, 50 B.R. 122, 125-27 (Bankr. D.N.D. 1985) (finding the debtor "converted nearly $130,000 of the proceeds to his own purposes" where the debtor used the funds to fund the farming operation).

[242] In re Tarrant, 84 B.R. at 833 (the court found embezzlement notwithstanding use of the proceeds in operation of the business); In re Imbody, 104 B.R. at 834 (Bankr. N.D. Ohio 1989) (holding debtors liable for embezzlement under § 523(a)(4) where they used crop proceeds to pay the I.R.S.).

[243] Cunningham v. Cunningham (In re Cunningham), 482 B.R. 444, 448 (Bankr. N.D. Ala. 2012).

[244] In re Hendry, 428 B.R. 68, 78 (Bankr. D. Del. 2010) (internal quotations and citations omitted).

[245] Id. (internal quotations and citations omitted).

purpose of avoiding its lien so that she could to continue to operate her businesses.[246]   Although

Mrs. Hall testified that she did not have the intent to deceive, the Court does not find her

unsupported assertion sufficient to overcome the circumstantial evidence presented by Nutrien,

particularly regarding the timing of events.   For these reasons, including additional details

specified below in Section V (Count VI), the Court finds Mrs. Hall's debt for conversion in the

amount of $556,367.69 to be non-dischargeable under 11 U.S.C. § 523(a)(4).[247]

## V.   Count VI – 11 U.S.C. § 523(a)(6) – Exception to Discharge for Willful and Malicious Injury to Property (Conversion)

Nutrien seeks a ruling that Mrs. Hall's debt for conversion is non-dischargeable under

11 U.S.C. § 523(a)(6).   A debt "for willful and malicious injury by the debtor to another entity

or to the property of another entity" is non-dischargeable.[248]   "'Willfulness' requires 'a showing

of an intentional or deliberate act.'"[249]   The actor must have intended the injury, not just the act

that led to the injury.[250]   "[M]alicious means the debtor's conduct was in conscious disregard

of another's rights."[251]   Specifically, "[m]alice can be established by a showing of implied or

constructive malice."[252]

---

[246] See In re Ebrahimpour, 2024 Bankr. LEXIS 657 at *13-14.

[247] See, e.g., infra discussion in Section V (Count VI) related to the Dischargeability Complaint ($205,705.69 conversion as to HCF, $59,970 conversion as to FP for misdirected funds and $290,692 conversion as to FP for crop insurance).

[248] 11 U.S.C. § 523(a)(6).

[249] Maxfield v. Jennings (In re Jennings), 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting In re Walker, 48 F.3d 1161, 1165 (11th Cir. 1995).

[250] Kawaauhau v. Geiger, 523 U.S. 57, 61-62, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998).

[251] In re Petsch, 82 B.R. 605, 607 (Bankr. M.D. Fla. 1988).

[252] Prosports Mgmt. of the S., Inc. v. Jacobs (In re Jacobs), 243 B.R. 836, 846 (Bankr. M.D. Fla. 2000).

While liability for conversion does not *per se* render the debt non-dischargeable,[253] bankruptcy courts from the Middle District of Florida have held that conversion may be a "willful and malicious injury" under § 523(a)(6) depending on the circumstances.[254]

As discussed above, the Court found Mrs. Hall liable for conversion as to the $556,367.69 in funds belonging to BFH LLC which were misdirected through related entities for the purpose of avoiding Nutrien's lien.  Nutrien argues that Mrs. Hall took these actions to avoid the FSA notices.  The Court agrees and finds this is the most plausible explanation for HCF entering into the contract with Associated Grain immediately after the Halls received the FSA notices.  Mrs. Hall's explanation as to why the crop insurance was deposited into FP's account instead of BFH LLC's account is also questionable.  Specifically, Mrs. Hall testified that the decision was based on a timing issue because it was unclear if BFH LLC's bank account would still be open when the funds were ready to be deposited. While on its face this could be considered a rational explanation, the Halls could have negated the concern by leaving the BFH LLC account open until the funds were deposited.  Further, this explanation is not convincing because only some of the funds were immediately transferred from FP to BFH LLC.

Upon review, the Court finds the evidence overwhelmingly shows that Mrs. Hall was in control of these transactions.  This finding is highlighted by: (i) Mr. Hall's testimony that Mrs. Hall handled the bookkeeping and communicated with their accountant regarding the

---

[253] Davis v. Aetna Acceptance Co., 293 U.S. 328, 332 (1934) ("[A] willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances.").

[254] In re Jacobs, 243 B.R. at 846; see also Allied Credit Corp. v. Griffen (In re Griffen), 195 B.R. 951, 953 (Bankr. M.D. Fla. 1996) (stating "[i]t is well settled that if a plaintiff's security interest was perfected, defendants' actions [of selling collateral without lender's consent] would be considered malicious and willful under 11 U.S.C. § 523(a)(6)."); In re Petsch, 82 B.R. at 607 (finding debtor's disposal of collateral "without the permission or knowledge of the lienholder, and the debtor understands the effect of the security agreement, such an unauthorized disposition constitutes a willful and malicious conversion so as to render the debt arising therefrom nondischargeable.").

purpose behind company transactions;[255] (ii) Gary Stewart's testimony that Mrs. Hall moved funds between the companies to pay bills;[256] and (iii) the deposition testimony by an employee that she would not move funds without approval from Mrs. Hall.[257]

Similar to the instant case, a court in the Northern District of Florida held a debt to be non-dischargeable for conversion under § 523(a)(6) simply because the debtor used crop proceeds without the secured creditor's consent and failed to account for a portion of the proceeds.[258]  Thus, while the Court finds credible the Halls' testimony that the funds were largely used to cover business expenses, this is not an absolute defense to liability for conversion.  Further, the Court gives limited weight to the Halls' testimony given the timing and circumstances surrounding the transactions.

Notably, Mrs. Hall acknowledges that she knew of Nutrien's lien,  and the Court finds she sufficiently understood Nutrien's rights under the security agreement.[259]  Although Mrs. Hall was unaware that BFH Produce received an FSA Notice from Nutrien, she stated that BFH Produce should have issued joint checks to Nutrien based upon receipt of the FSA Notice.[260]

---

[255] Pl.'s Ex. 229, B. Hall Dep., p. 36, ll. 9–13 (testifying that the work he did for BFHS included "[e]verything that needed to be done, except for bookkeeping"); id. at p. 37, ll. 9–23 (testifying that Mrs. Hall "tried to make sure we were getting paid the right amounts for whatever we had sold" and kept the books); id. at p. 40, ll. 7–9 (testifying that Mrs. Hall communicated with the Halls' accountant on behalf of BFHS).

[256] Pl.'s Ex. 406, G. Stewart Dep., at p. 25, ll. 15–18 (testifying that he and Mrs. Hall were responsible for billing and recordkeeping for the farming operations); id. at p. 38, ll. 22–24 ("I know [Mrs. Hall] moved money around from time to time because the cash pressure from the merchant cash advances was killing them."); id. at pp. 59-60 (testifying that only Mrs. Hall transferred funds between the Hall Entities); id. at p. 66, ll. 12-25 (testifying that Mrs. Hall would move BFHS's funds among the Hall Entities' accounts).

[257] Pl.'s Ex. 414, J. Baylis Dep., pp. 12-13 (testifying that she would not make payments or transfers for HCF, Eastern Shore, or BFHS without obtaining authorization from Mrs. Hall); id. at p. 27, ll. 4-13 (testifying that Mrs. Hall "did any bank transfers" between BFHS and HCF).

[258] In re Scurlock, 1987 U.S. Dist. LEXIS 3969, at *5 (N.D. Fla. Apr. 1, 1987) (finding that the debtor "couldn't really explain what happened to the proceeds from the sale of crops except to say they were used in the farming operation.").

[259] Pl.'s Ex. 52, pp. 26-27 (Mrs. Hall stated during her deposition that she had worked at a bank for 25 years, understood lien rights and did not contest that Nutrien had a lien on BFH LLC crops); see also Day 4 Trial Transcript p. 18, ll. 8-9.

[260] Pl.'s Ex. 52, pp. 44-45, 188-89.

Mrs. Hall was also aware that Hollar & Greene issued joints checks to BFH Produce and Nutrien in February of 2018.[261]  Seemingly to justify the Halls' efforts to avoid Nutrien's lien, Mrs. Hall testified that Nutrien's refusal to release $12,000.00 from the joint checks resulted in H&M losing $500,000.00 worth of cabbage.  Shortly thereafter, HCF entered into a contract with Associated Grain.  The timing of this contract further demonstrates the Halls' intent to circumvent Nutrien's lien rights as asserted in the February 2018 FSA Notices.[262]

The deposit of the crop insurance proceeds into the FP account instead of the BFH LLC account is also troubling.  Mrs. Hall testified that she was aware of Nutrien's lien on the crop insurance,[263] and that the funds should have been deposited into a bank account for BFH LLC.  Contrary to this acknowledgment, she deposited the funds into an FP account because she and Mr. Hall were in the process of closing BFH LLC's bank account.  The Court does not find this explanation credible because the crop insurance proceeds were deposited into FP's account in December of 2018, and the Halls did not close the BFH LLC bank account until four months later in April of 2019.[264]  The Halls simply could have left the BFH LLC account open pending the deposit of the crop insurance proceeds.

While the Eleventh Circuit has recognized that a creditor may waive its right to except a debt from discharge based on a claim for conversion if the creditor fails to take reasonable steps to protect its collateral,[265] that scenario did not occur here.  The evidence shows Nutrien took aggressive action to protect its collateral, including sending notices of default to the Halls, issuing FSA notices, seizing joint checks issued by Hollar & Greene, and taking legal action

---

[261] Pl's Ex. 544.
[262] Pl's Exs. 414.21; 52.23-52.26, 231.6-231.8.
[263] Day 4 Trial Transcript, p. 60, ll. 1-3 (Mrs. Hall testified that "Nutrien probably had a lien on [the crop insurance]."; Pl's Ex. 52, p. 156.
[264] Pl's Ex. 512, p. 215.
[265] In re Wolfson, 56 F.3d 52, 55 (11th Cir. 1995).

(including filing the 2018 Action and the 2020 Action).  Importantly, part of the waiver noted by the Eleventh Circuit involved the creditor's inaction despite full knowledge of the borrower's action to sell the collateral.[266]  In the instant case, Nutrien did not have full knowledge of the Halls' questionable actions.

Based on the foregoing, the Court finds that Mrs. Hall knew that some of her actions were substantially certain to cause injury to Nutrien.[267]  Accordingly, based on the facts and circumstances of this case, the Court deems Mrs. Hall's debt for conversion in the amount of $556,367.69 to be non-dischargeable under 11 U.S.C. § 523(a)(6).

## VI.    Remaining Counts Under 11 U.S.C. § 523(a)(6)

Upon review, the relief sought in the remaining counts will be denied based upon the following: (i) Count VII is contingent on liability under Count XII of the 2020 Action, and the Court has already found Mrs. Hall not liable under that count; (ii) Count VIII is contingent on liability under Count I of the 2020 Action, and the Court has already found Mrs. Hall not liable under that count; (iii) Count IX is contingent on liability under Count XIII of the 2020 Action, and the Court has already found Mrs. Hall not liable under that count; (iv) the issues under Count X have already been addressed *supra* under Counts II & VI of the Dischargeability Proceeding and additional relief sought will be denied; and (v) Count XI is contingent on liability under Count III of the 2020 Action, and the Court has already found Mrs. Hall not liable under that count.

---

[266] Id. at 54 (creditor "knew of and failed to object to the Farm's sales of collateral.").
[267] The Court recognizes that not all of Mrs. Hall's actions were intended to injure Nutrien.

**<u>Conclusion</u>**

This is a very unfortunate and difficult case that the Court has grappled with tremendously.  The Halls are good, hardworking people who were faced with a series of tough life circumstances that led them down a wayward journey.  The Court recognizes that at the heart of the matter was the Halls' quest to save their family businesses.  The law dictates the conclusions reached in this opinion but the humanity of what the Halls have been through is not lost on the Court.  The Court will enter a separate Order consistent with these Findings of Fact and Conclusions of Law.